**In re: NATURAL GAS COMMODITY LITIGATION**

**No. 03 Civ.6186 VM.**

United States District Court,
S.D. New York.

Sept. 24, 2004.

### DECISION AND ORDER AND OPINION

MARRERO, District Judge.

In these consolidated actions, Plaintiffs, traders of natural gas futures contracts on the New York Mercantile Exchange ("NY-MEX"), bring claims under the Commodity Exchange Act against a group of energy companies ("Defendants") alleging manipulation of the natural gas futures market. Plaintiffs claim that by falsely reporting data on trades of natural gas in the physical market, the defendant companies were able to manipulate the price of natural gas futures contracts for their own benefit and to the detriment of Plaintiffs.

Defendants have filed a joint motion to dismiss the several complaints, and several Defendants and corporate pairs of Defendants have separately filed a total of nine additional motions to dismiss the complaints as against them should the Court deny the joint motion to dismiss.

The main complaint in this action contains 175 paragraphs and is 48 pages long, plus exhibits. Pervading much of Defendants' motions are variants of the theme, so common in motions to dismiss, that the complaint amounts to nothing more than lots of sound and fury, signifying nothing. With exceptions discussed below, most of the Defendants argue that the complaints fail to state a claim against them and provide insufficient notice of the Plaintiffs' claims. Defendants also argue that the CEA's statute of limitations bars Plaintiffs' claims.

The Court is, for the most part, not persuaded that these Defendants are ingenues making their first appearance at the debutante ball. In fact, if certain federal government proceedings describing the scheme of misconduct asserted in this case bear any measure of truth, many of the thirty Defendants here may have compromised their claim to Snow–White inno-

cence long ago. A large number of Defendants have reached settlements with the Commodities Futures Trading Commission ("CFTC") for millions of dollars each to resolve charges grounded on the same claims of false reporting of trade data alleged here. As explained below, Plaintiffs here essentially endeavor to connect Defendants' alleged false reporting of trade data in the physical gas market to manipulation of the natural gas futures market. In light of the liberal notice pleading standard governing federal litigation, and the recently concluded investigations by the CFTC and the Federal Energy Regulatory Commission ("FERC") into the same underlying conduct by Defendants as alleged in this case—proceedings that resulted in over $100 million in fines already paid by them—the Court for the most part cannot ignore common sense and accept Defendants' intimations of surprise that Plaintiffs' complaint in this action is the first thing they have heard about these allegations and that it does not furnish enough notice of what these claims could possibly relate to. Furthermore, Plaintiffs have not yet availed themselves of their oppor-

tunity to amend their complaints. Accordingly, for the reasons discussed below, the Court denies in part and grants in part, without prejudice, the motions of the various Defendants to dismiss the complaints in this litigation.

## I. *FACTS AND PROCEEDINGS*[1]

The Complaints allege that Defendants, a group of companies that market and trade natural gas in the physical and futures markets,[2] acted together to unlawfully manipulate the prices of natural gas futures and option contracts traded on the NYMEX between January 1, 2000 and December 31, 2002 (the "Class Period"). Plaintiffs claim that they suffered losses when they bought and sold NYMEX natural gas futures contracts during the class period—losses they attribute to actions of Defendants.

## A. *COMMODITIES FUTURES MARKETS*

Briefly stated, a futures contract is an agreement to buy or sell a commodity and deliver that item at a certain date in the future.[3] All aspects of the contract, such

---

1. In a motion to dismiss the Court must accept as true all factual allegations made in the complaint. *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 265 F.Supp.2d 254, 259 (S.D.N.Y. 2003). Accordingly, this factual summary is derived principally from the Consolidated Class Action Complaint dated January 20, 2004 in case # 03 CV 6186 (the "CCAC") and the Class Action Complaint dated February 2, 2004 in related case # 04 CV 0758 (the "RCAC" and together with the CCAC, the "Complaints"). The Complaints are essentially the same except for their discussion of the alleged actions of specific Defendants. Because the CCAC addresses all but four Defendants, the Court will rely primarily on it rather than cite to the identical passages in both complaints throughout this opinion.

2. Defendants are: AEP Energy Service, Inc.; American Electric Power Co., Inc.; Aquila Energy Marketing Corp.; Aquila Merchant Service, Inc.; Calpine Energy Services, L.P.;

Cinergy Corporation; Cinergy Marketing and Trading, L.P.; CMS Field Services; CMS Marketing Services and Trading; Cook Inlet Energy Supply, LLC; Coral Energy Holding, LP; Coral Energy Resources, LP; Duke Energy Trading and Marketing, LLC; Dynegy Marketing and Trade; El Paso Corporation; El Paso Merchant Energy, L.P.; Encana Corporation; Enserco Energy, Inc.; Entergy-Koch Trading, L.P.; Eprime, Inc.; MidAmerican Energy Company; Mieco, Inc.; Oneok Energy Marketing and Trading Company, L.P.; Oneok Inc.; Reliant Energy Services, Inc.; Sempra Energy Trading; WD Energy Services, Inc.; West Coast Power, LLC; Williams Companies, Inc.; Williams Energy Marketing and Trading Company; and John Does 1–100.

3. For additional descriptions of the workings of futures contracts and commodities markets, see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct.

as the quantity, quality, and delivery date, are standardized except for the price. The price is determined by traders in the commodity who negotiate at a commodities exchange. The party selling the commodity, and thus the party obligated to deliver the commodity on the delivery date, is called the "short" and is said to hold a "short position" on a futures contract. The buyer, who is obligated to accept delivery of the commodity, is the "long" and holds a "long position" on a futures contract.

Futures contracts serve as a form of insurance for producers and processors of commodities against potential price alterations. As a simple example, an orange grower may acquire a short position in oranges to protect himself against a decline in orange prices in the event of a bumper crop, while a juice producer may acquire a long position to guard against a price increase in oranges should foul weather destroy the season's orange crop. Futures contracts also enable speculators to profit from anticipated changes in the price of a commodity.

Buyers and sellers of commodity futures do not deal directly with each other, but instead interact with a commodities exchange, which serves as a clearing house. Because all futures contracts are standardized except for the price, a party holding one position in a futures contract may cancel its obligation by acquiring an equal and opposite position in the same contract. Any difference between the price of the initial contract and the price of the offsetting contract is the profit or loss on the contract. This is the ordinary practice.

Very few futures obligations result in actual physical delivery of a commodity.

The NYMEX trades futures contracts for, among other things, the delivery of natural gas at the Henry Hub for the present calendar month (the "spot month") and for each of the next 72 consecutive months. The Henry Hub is a Louisiana facility where several gas pipelines converge and from where gas can be directed to many regions of the country.[4]

Natural gas is physically traded though "over the counter" or "physical" markets at over 100 places across the country. The prices of gas trades in the physical market are collected by energy industry publications, who receive the price information from energy companies and then calculate and publish the daily and weekly absolute range, common range, and midpoint of the common range of physical gas trades for the prior day and week.

The price paid for physical delivery of gas by one party to another on a given day at Henry Hub (the "Spot Price") often affects the price of futures contracts for natural gas. Speaking generally, traders of commodity futures examine the spot price and spot price trends when determining what actions to take in the futures market.

## B. THE ALLEGATIONS IN THE COMPLAINT

### 1. Price Manipulation

Plaintiffs allege that during the Class Period, Defendants "manipulated the price and volume information of their natural gas trades to trade publishers." (CCAC

1825, 72 L.Ed.2d 182 (1982); *Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980); *In re Soybean Futures Litiq.,* 892 F.Supp. 1025 (N.D.Ill. 1995); Benjamin Kozinn, Note, *The Great Copper Caper: Is Market Manipulation Really*

*a Problem in the Wake of the Sumitomo Debacle?,* 69 Fordham L.Rev. 243 (2000).

**4.** *See United States Comodity Futures Trading Comm'n v. Enron Corp.,* No. H–03–909, 2004 WL 594752 (S.D.Tex. Mar.10, 2004).

¶ 59.) Plaintiffs claim that Defendants intentionally submitted false price and volume information on spot trades to several of the gas industry publications that collect that information with the goal of artificially skewing the published reports on natural gas trades in the physical market, and thereby artificially altering the futures market for natural gas, which is determined at least in part by those published reports. In the words of the CCAC, the Defendants "planned and executed a scheme designed to cause price instability and increase volatility in spot prices and thereby manipulate the price of natural gas futures and options traded on the NYMEX to artificial levels." (CCAC ¶ 12.)

The FERC and the CFTC each investigated allegations of natural gas price manipulation since early 2000. Over the course of several months after the FERC published its preliminary findings in August 2002, several entities that are defendants in this litigation—Dynegy, West Coast Power, El Paso Merchant, AEP, Williams, and CMS—publicly admitted that some of their employees had reported false and inaccurate information on gas trades to certain energy publications.

The FERC released its final report in March 2003 and found significant manipulation of the natural gas market in the form of efforts by gas companies to alter the published price indices of natural gas through false reporting of trade data. *See* FERC, *Final Report on Price Manipulation in Western Markets: Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices,*

FERC Docket No. PA02–2–000 (March 2003) (the "FERC Final Report"), *available at* http://www.ferc.gov/industries/electric/indus–act/wem/pa02–2.asp.

The CFTC has entered into settlement agreements with at least sixteen entities[5] which are Defendants in this litigation as a result of its investigation into allegations of manipulation of natural gas markets, and has collected a total of at least $180 million in civil penalties from those entities. The federal government has also brought successful criminal prosecutions against now-former employees of several of those entities.

The CCAC alleges that "[d]uring the Class Period, Defendants submitted false natural gas trading information, including artificial natural gas price and volume information, to numerous industry publications and reporting firms that publish natural gas spot price indices." (CCAC ¶ 66.) Next, Plaintiffs assert that "Defendants, as major participants in the physical natural gas market, had the ability through their reporting of physical natural gas transactions to influence the price of NYMEX natural gas futures." (CCAC ¶ 67.) Defendants "intended to manipulate NYMEX natural gas futures prices during the Class Period through their manipulation of the published indices." (CCAC ¶ 69.) Plaintiffs claim that they and others similarly situated "were damaged because NYMEX natural gas futures prices were not determined by market forces, but instead by the Defendants' illicit manipulative activities

5. In connection with its investigation into manipulation of the natural gas market since early 2000, the CFTC has entered into settlements with Dynegy Marketing & Trade and West Coast Power, LLC; El Paso Merchant Energy, L.P.; WD Energy Services, Inc. (formerly Encana Energy Services, Inc.); The Williams Companies, Inc. and Williams Energy Marketing & Trading (now Williams Power

Company); Enserco Energy, Inc.; Duke Energy, Trading and Marketing LLC; Reliant Energy Services; CMS Marketing Services & Trading and CMS Field Services; Aquila Merchant Services, Inc.; Entergy–Koch Trading, LP; E Prime, Inc.; Oneok Energy Marketing & Trading Company, LP and Oneok, Inc.; and Calpine Energy Services, LP.

and improperly-wielded market power." (CCAC ¶ 74.)

The CCAC provides more detailed allegations of fraudulent reporting against 18 of the defendant entities. Much of that detail is borrowed from the FERC Final Report. For example, Plaintiffs allege that out of 3600 trades that AEP and AEP Energy traders reported to one industry publisher between November 2000 and October 2002, 2800 were false, misleading, or knowingly inaccurate. (CCAC ¶ 85.) Similarly borrowing from the FERC Final Report, the CCAC asserts that Duke Energy Trading and Marketing reported fraudulent trading information in that "8 percent of the reported monthly trades were inaccurate in terms of price, volume or both, and 22 percent of reported daily trades were inaccurate in terms of price, volume or both." (CCAC ¶ 103.)

### 2. Wash Trading

The CCAC also alleges that ten of the Defendants (the "Wash Trading Defendants")[6] manipulated gas futures prices by engaging in illegal wash trades in the physical market. The FERC Final Report defines wash trades a "a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership." See FERC Final Report at VII–1. Wash trading can create a false impression of greater trading activity and thus greater liquidity for a given item. See id. Wash trading can also affect the average trading price for an item. See id. The FERC Final Report indicated that CMS Energy, Dynegy, Williams and Reliant had already publicly admitted to engaging in wash trades.

The CCAC asserts that between November 1999 and at least December 2001, Enron Online ("EOL"), operated by Enron Corporation, was the leading Internet-based trading platform for physical energy and energy derivatives. (CCAC ¶ 128.) Unlike a traditional stock or commodities exchange such as NYMEX, which uses a many-to-many format to match buyers and sellers, EOL uses a one-to-many format in which Enron or an Enron affiliate is on one side of every transaction. Over EOL, Enron's own traders would list a bid price at which Enron would purchase natural gas and an offer price at which Enron would sell. At certain times, called "choice markets," Enron's traders would list the same figure as their bid price and offer price. These choice markets enabled gas companies to engage in wash trades. See FERC Final Report at VII–1—VII–2.

The CCAC cites the FERC Final Report as stating that during choice market periods for natural gas trading between January 2000 and November 2001, Entergy–Koch Trading engaged in 61 wash trades, or 16.1 percent of the total wash trades completed during choice markets in that time period; Cook Inlet Energy Supply LLC completed 22 wash trades or 5.8 percent; MidAmerican Energy Company completed 21 wash trades or 5.6 percent; and Mieco completed 19 wash trades or 5 percent. (CCAC ¶ 135.)

The CCAC alleges that "[t]hrough EOL, the Wash Trading Defendants had unprecedented influence over the natural gas market. Through their use of Choice Markets on EOL, the Wash Trading Defendants exploited the EOL system and had unprecedented influence to manipulate natural gas spot prices by taking advan-

---

**6.** The Wash Trading Defendants are: CMS Marketing Services & Trading; CMS Field Services; Dynegy Marketing and Trade; Williams Companies, Inc.; Williams Energy Marketing and Trading Company; Reliant Energy Services, Inc.; Entergy–Koch Trading L.P.; Cook Inlet Energy Supply, LLC; MidAmerican Energy Company; and Mieco Inc.

tage of the fact that Enron was the counterparty to every wash trade." (CCAC ¶ 136.)

### 3. *Churning*

Next, the CCAC makes an allegation of "churning" against defendant Reliant Energy Services, Inc. ("Reliant"). The CCAC states that since June 2000, Reliant "abused its dominant position in the natural gas spot market by employing commodities trading strategies for buying physical spot natural gas designed to manipulate natural gas spot prices and NY-MEX natural gas futures contracts." (CCAC ¶ 140.) The CCAC relies on the FERC Final Report, which found that "Reliant's rapid-fire sale and purchase of gas in amounts far in excess of its needs raised the price of gas on EOL significantly." (CCAC ¶ 143, FERC Final Report at II–58.) In a chart, the CCAC identifies 24 days on which Reliant engaged in churning in the natural gas market and cites the amount of gas purchased and sold, Reliant's net purchase, the percentage of Reliant's total transactional volume of natural gas traded on that day attributable to churning, and the percentage of all EOL trading on that day attributable to Reliant's activities. (CCAC ¶ 151.)

### 4. *Fraudulent Concealment*

On November 20, 2002, the Lieutenant Governor of California filed suit on behalf of California consumers against several entities that are defendants in this action for the same activities alleged in the CCAC. Plaintiffs here assert that that lawsuit provided "the first public reports of any government action relating to Defendants' unlawful conduct." (CCAC ¶ 162.) Plaintiffs filed the original Class Action Complaint in this action on August 18, 2003. Plaintiffs argue that because Defendants "employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in November 2002." (CCAC ¶ 163.)

### 5. *Substantive Allegations*

Ultimately, the CCAC presents two claims for relief. In Count I, Plaintiffs allege that Defendants "manipulat[ed] the price of natural gas futures and options, and/or the price of the natural gas underlying those contracts," in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a). (CCAC ¶ 167.) Plaintiffs also allege that Defendants engaged in wash sales in violation of Section 4c of the CEA, 7 U.S.C. § 6c. In Count II, Plaintiffs allege that Defendants aided and abetted each other, John Does 1–100, and other unnamed entities in their unlawful practices under the CEA, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

All Defendants now move to dismiss the complaints pursuant to the CEA and Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) for failure to state a claim upon which relief can be granted and for failure to file their claims within the applicable statute of limitations. Several defendants have also filed individual motions to dismiss the complaint.

## II. STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *See Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000). The Court may grant a motion to dismiss under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiffs can prove no set of facts in support of his claim which

would entitle him to relief." *Krimstock v. Kelly,* 306 F.3d 40, 48 (2d Cir.2002) (internal citations omitted).

## III. *DISCUSSION*

In their joint motion, Defendants argue that Plaintiffs have failed to state a claim under any provision of the CEA cited in the CCAC, and that Plaintiffs filed the CCAC after the expiration of the statute of limitations. Defendants fault the 175–paragraph, 48–page CCAC for stating insufficient facts to support any violation of the CEA, and for failing to allege all the elements of a claim for manipulation or aiding and abetting. Defendants also assert that Plaintiffs were on notice of the claims at issue as early as June 2000, and alternatively that Plaintiffs have failed to allege fraudulent concealment with the requisite degree of specificity demanded by Fed.R.Civ.P. 9(b).

## A. *THE MANIPULATION CLAIM*

Defendants argue that Plaintiffs' manipulation claim under Section 9(a) of the CEA, as presented in the CCAC, contains merely conclusory allegations and lacks sufficient factual support to withstand a motion to dismiss. Plaintiffs counter that they have described Defendants' conduct with adequate specificity to provide notice to Defendants of the claims against them.

Federal Rule of Civil Procedure 8(a)(2) mandates that a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Swierkiewicz v. Sorema N.A.,* the Supreme Court emphasized that the purpose of Rule 8 is merely to provide a fair notice to a defendant of the plaintiff's claims, and that it is the role of the litiga-

tion tools of discovery and summary judgment to weed out unmeritorious suits. 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The Court reiterated that the simplified, notice-pleading standard of Rule 8(a) applies to almost all civil actions. *Id.* at 513, 122 S.Ct. 992. Additionally, and arguably relevant here, the Court noted that "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) [7] before responding." *Id.* at 514, 122 S.Ct. 992.

Defendants argue that the CCAC is so defective and lacking in specific facts that it fails even the liberal pleading standards of Rule 8(a). As noted above, the CCAC contains 175 paragraphs in 48 substantive pages (not including the signature block and exhibits). To be sure, length and specificity do not necessarily go hand in hand on the path to sufficient pleading. As one court has noted, "[a] complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *See Williams v. WMX Techs., Inc.,* 112 F.3d 175, 178 (5th Cir.1997). That said, as a complaint approaches Proustian magnitude (in length, at least), it may become more difficult for a defendant to convince a court that the complaint fails to provide adequate notice of the claims at issue. Indeed, Defendants protestations may have been more apt and worthy of a more sympathetic reception from this Court had they challenged the complaint for violating Rule 8's requirements that a pleading "shall contain a *short* and *plain* statement of the claim" and that all pleadings "shall be *simple,*

---

**7.** Fed.R.Civ.P. 12(e), Motion for More Definite Statement, provides in relevant part:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required

to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.

*concise* and direct," rather than arguing that the CCAC lacks sufficient information to provide notice of a claim. Fed.R.Civ.P. 8. (emphasis added).

Defendants argue that the Court must dismiss the manipulation claim because the Complaints inadequately allege the elements of that claim under the CEA. This argument raises several issues, including what the elements of a manipulation claim are, whether a plaintiff must plead all of those elements in a complaint, and, if so, whether Plaintiffs here did so adequately.

Courts have disagreed on the exact prerequisites of a manipulation claim under Section 9(a) of the CEA. Many have adopted the following four elements: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *See In re Soybean Futures Litig.*, 892 F.Supp. at 1045; *Grossman v. Citrus Assocs. of the New York Cotton Exch., Inc.*, 706 F.Supp. 221, 231 (S.D.N.Y.1989). Other courts have rephrased the elements as: (1) manipulative conduct; (2) a specific intent to create an artificial price; (3) a causal relationship between the defendant's manipulative conduct and the resulting price; and (4) an artificial price. *See Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F.Supp. 1472, 1493 (S.D.N.Y.1990). *See also, In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 89–90 (S.D.N.Y.1998) ("To prevail on a cause of action for commodities manipulation under the CEA, plaintiffs must establish the following elements: (1) the existence of an artificial price, (2) an intent to cause an artificial price, and (3) causation of the artificial price by the defendants.").

Defendants, relying on the elements as stated in *Soybean Futures* and *Grossman,* argue that the complaints must be dismissed because Plaintiffs failed to adequately allege that the Defendants possessed market power. Paragraph 67 of the CCAC states that "Defendants, as major participants in the physical natural gas market, had the ability through their reporting of physical natural gas transactions to influence the price of NYMEX gas futures." (CCAC ¶ 67.) Later, the CCAC states that "Defendants possessed, by virtue of their position as major physical natural gas market participants, the ability to manipulate the price of NYMEX natural gas futures contracts." (CCAC ¶ 124.) Defendants characterize those allegation as mere "uninformative boilerplate." (Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Consolidated Class Action Complaint, dated Feb. 19, 2004, ("Joint Def. Memo.") at 9.)

Assuming for the moment only that market power is an element of a manipulation claim, it is still necessary to determine whether such an allegation is required at this stage of the litigation, before turning to whether Plaintiffs adequately alleged market power. As discussed above, in *Swierkiewicz* the Supreme Court emphasized the liberal pleading rules for a complaint encapsulated in Rule 8(a). 534 U.S. at 512–14, 122 S.Ct. 992. In light of *Swierkiewicz* and Rule 8(a), at least one court in this district has repeatedly stated that a plaintiff need not list the elements of a claim in a complaint. *See Hutton v. Priddy's Auction Galleries, Inc.*, 275 F.Supp.2d 428, 432 (S.D.N.Y.2003) (stating that under Rule 8(a), a plaintiff need not state the elements of a claim in a complaint); *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770, 2003 WL 1858153 (S.D.N.Y. Apr. 10, 2003); *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 323 (S.D.N.Y.2003).

Some courts, even before *Swierkiewicz,* had reached the same conclusion. As the Seventh Circuit noted in 1998, "a com-

plaint need not spell out every element of a legal theory to provide notice" to a defendant. *Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999) (quoting *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir.1998)). Similarly, the District of Columbia Circuit noted in 2000 that a complaint "need not plead law or match facts to every element of a legal theory." *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1115 (D.C.Cir.2000) (internal citations omitted). *See also, Roe v. Aware Woman Ctr. for Choice, Inc.,* 253 F.3d 678, 683 (11th Cir.2001) (stating that Rule 8(a)(2) does not require a complaint to set forth every element . of a claim, though noting that a complaint must still provide "direct or inferential allegations respecting all the material elements necessary to sustain a recovery").

The Appendix of Forms to the Rules of Civil Procedure contains several sample complaints, all of which would satisfy the pleading requirements of Rule 8(a), and all of which are shorter and less detailed than the CCAC by several orders of magnitude. *See* Fed.R.Civ.P. 84; Fed.R.Civ.P. Appendix Forms 3–11. For example, Form 9, a sample negligence complaint, contains just three paragraphs. After establishing jurisdiction in paragraph one, paragraph two, in its entirety, states "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway." Fed.R.Civ.P. Appendix Form 9. Paragraph three then states, in general terms, the plaintiff's injuries and his damages. As other courts have noted, the sample complaint in Form 9 does not even list the elements of negligence, let alone drone on for pages and pages about the existence of the driver's duty of care, proximate causation, or foreseeability of the injury. *See Swierkiewicz,* 534 U.S. at 513 n. 4, 122 S.Ct. 992; *In re Initial Pub. Offering,* 241 F.Supp.2d at 323.

The test for determining the sufficiency of a complaint is not whether it recites all elements of an asserted claim, but rather whether the document provides fair notice to the defendant of the claims against it and the grounds on which those claims rest, thereby enabling the defendant to prepare an informed response. *See Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992; *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nothing more is required.

■ Turning then to the present case, Defendants argue that the CCAC contains merely conclusory assertions and thus fails to "establish" a claim under the CEA. (Joint Def. Memo at 6.) Defendants maintain, for example, that the causal chain between their alleged misconduct and the Plaintiffs' alleged injury is broken, and that the CCAC "improperly relies on a highly speculative causal link." (Joint Def. Mem. at 12.) But to survive a motion to dismiss, Plaintiffs need not *establish* their claims. A complaint need not *prove* that a defendant's conduct caused the plaintiff's injury. Instead, the complaint must simply allege that the defendant caused the plaintiff's injury, though obviously the Plaintiffs will be able to recover only if they can ultimately prove causation—after they have had a reasonable opportunity to gather evidence through discovery and their proof has been put to the test, by means of a dispositive motion or at trial. As discussed above, the purpose of a complaint is merely to fairly apprise defendants of the claims they are summoned to contest. A court may dismiss a complaint only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Resnik v. Swartz,* 303 F.3d 147, 150–51 (2d Cir.2002) (quoting *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999)). Defendants' arguments that

Plaintiffs' theory of causation is inadequate, that their allegation of specific intent is insufficient, or that their assertion of artificial prices is inept, are more properly made in a motion for summary judgment rather than a motion to dismiss. There is no doubt that to recover on their manipulation claim, Plaintiffs will have to produce evidence sufficient to establish all the elements of that claim—evidence, incidentally, that may now be uniquely in the possession of Defendants and obtainable only through the formal process of discovery authorized by the federal rules. But Plaintiffs need not do so at this stage of the litigation. Indeed, as discovery has not yet occurred, it would be most unreasonable to expect them to be able to.

Some courts have likened manipulation to fraud, which must be alleged with particularity in a complaint under Fed. R.Civ.P. 9(b) ("FRCP 9(b)"). *See, e.g., Slusser v. CFTC,* 210 F.3d 783, 786 (7th Cir.2000) (classifying manipulation as a "species of fraud"). In ordinary usage, fraud and manipulation are no doubt similar to the extent that both suggest some degree of deceitfulness. But although Defendants raise the requirements of FRCP 9(b) to contest Plaintiffs' fraudulent inducement allegations, they do not argue that the manipulation claim under § 9(a) of the CEA should be subject to that heightened standard, and indeed it appears that no court has required a plaintiff to plead a claim for manipulation under CEA § 9(a) with the same particularity that Fed. R.Civ.P. 9(b) requires of claims charging fraud. In *Three Crown Ltd. P'ship v. Caxton Corp.,* the court noted, without deciding, the possibility that FRCP 9(b)'s particularity requirements might apply to claims for manipulation under CEA § 9(b), but recognized that the CEA has separate provisions for fraud and manipulation,[8] which could suggest that CEA manipulation claims need not be set forth with particularity. 817 F.Supp. 1033, 1043 n. 19 (S.D.N.Y.1993).

Even if Plaintiffs do not need to plead all of the elements of a manipulation claim or satisfy the heightened pleading requirements of Rule 9(b), their complaint may not survive if it consists solely of conclusory allegations and is totally lacking any facts. *See Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) ("[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (internal citations omitted). Defendants argue that the CCAC fails this standard.

Defendants maintain that "[w]here, as here, Defendants are accused of manipulating a futures market by engaging in allegedly manipulative conduct outside that market, it is particularly appropriate that Plaintiffs explain how that manipulation was supposedly accomplished." (Joint Def. Mem. at 9.) There is an element of disingenuousness to Defendants' pleas of ignorance as to Plaintiffs' claims. As stated above, many of the same Defendants have already paid multimillion dollar fines to the CFTC to settle investigations into the very same misbehavior underlying Plaintiffs' suit, and the FERC Final Report also discusses that unlawful conduct. Common sense suggests that Defendants, or at least many of them, know full well sufficient details about the wrongs Plaintiffs allege to enable them to answer the complaint, itself a procedure that at this stage of the litigation demands not much more detail of acknowledgment or denial than is required of the complaint and that, as all well-seasoned defense counsel are aware, is routinely employed to respond to the most verbose pleadings with one word replies.

---

8. *See* 7 U.S.C. § 6b (fraud) and 7 U.S.C. § 13 and 13b (manipulation).

The Complaints, beyond their lengthy recitation of the events at issue, incorporate the FERC Final Report and many of the publicly-filed settlement agreements and orders that Defendants have reached with the CFTC. It is well settled that this Court may consider those documents in the course of deciding a motion to dismiss without converting that motion into a motion for summary judgment. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). Moreover, the Court would be remiss if it failed to take judicial notice of those documents, as provided by Fed.R.Evid. 201. *See id.*

The FERC Final Report and the various CFTC settlement agreements describe the same conduct alleged in the Complaints. While the Court is mindful that only a handful of defendants have publicly admitted to the conduct alleged, and that the Complaints here go somewhat beyond the FERC and CFTC investigations to allege manipulation of the futures market, the Court cannot ignore, at the motion to dismiss stage of this litigation, that many of the Defendants have been subjected to lengthy investigations by the FERC and CFTC into the charges asserted here, that the conduct has been described in the FERC Final Report and in the CFTC settlement agreements and orders, and finally that many defendants have paid millions of dollars in fines for this conduct. That reality, along with the allegations as set forth in the Complaints, persuade the Court that Defendants are on notice of the claims against them. Accordingly, the Court is unable to conclude as a matter of law that there is no possible set of facts that Plaintiffs could prove to recover on those claims.

### B. *WASH TRADING*

Defendants argue that what they term Plaintiffs' " 'wash trade' claim" (Joint Def. Mem. 18) must be dismissed because Plaintiffs are unable to meet the requirements for maintaining a private action for wash trading under § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).[9] Defendants correctly note that subparagraphs A through C of § 25(a)(1) require a degree of privity between the parties, and that Plaintiffs here do not allege, nor could they, that such privity existed. They then argue that the wash trading claim cannot satisfy subparagraph D because that subparagraph is limited to price manipulation claims.

As Plaintiffs note, Defendants misread the CCAC. Plaintiffs do not allege a claim for wash trading under § 4c of the CEA, 7 U.S.C. § 6c, separate and distinct from their manipulation claim.[10] They do not seek a separate damage award for wash

---

**9.** 7 U.S.C. § 25(a)(1) provides that a private right of action against persons or entities who violate the CEA may be brought by anyone:

(A) who received trading advice from such person for a fee;

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—

(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);

(ii) a contract subject to section 23 of this title; or

(iii) an interest or participation in a commodity pool; or

(D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

**10.** Section 4c of the CEA, 7 U.S.C. § 6c, prohibits wash trades "involving the purchase or sale of any commodity for future delivery."

trading. Instead, Plaintiffs allege that some Defendants engaged in wash trading of natural gas as one means of manipulating the natural gas futures market.

It may be true, as Defendants argue, that Plaintiffs framed their wash trading allegations in this manner because they could not maintain a separate CEA § 4c wash trading claim. CEA § 4c appears to prohibit wash trades only in cases of commodities for future delivery, while Plaintiffs' allegations of wash trading in the present case revolve around trades of natural gas in the spot market. Defendants argue that a wash trading allegation which could not exist as a stand-alone claim under CEA § 4c should not be allowed to support a manipulation claim under CEA § § 9. They note that the wash trading cases cited by Plaintiffs all involved wash trading in futures contracts rather than wash trading in the underlying commodity.[11] In the present case, by contrast, Plaintiffs allege that the Wash Trading Defendants engaged in wash trading in the natural gas spot market as part of a scheme to manipulate prices in the natural gas futures market. But even if Plaintiffs might be unable to maintain a stand-alone wash trading claim under CEA § 4c because the alleged wash trades occurred in the physical market, it does not mean that Plaintiffs should be prevented from presenting evidence of wash trades in the physical market to prove their theory of manipulation in the futures market.

## C. AIDING AND ABETTING

Plaintiffs' second claim is for aiding and abetting the above violations of the CEA. Defendants first argue that this claim should be dismissed because Plaintiffs have failed to plead adequately a primary violation of the CEA and therefore there is nothing for which Defendants can be liable

for aiding and abetting. *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121 (5th Cir.1996). The Court has already determined that Plaintiffs have adequately pled a manipulation claim in the CCAC.

■ Defendants next attack the sufficiency of the pleadings of the aiding and abetting claim. Generally stated, to recover on an aiding and abetting claim under the CEA, a plaintiff must prove that the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective. *See 766347 Ontario, Ltd. v. Zurich Capital Mkts.*, 274 F.Supp.2d 926, 934–35 (N.D.Ill.2003) ("*Zurich II*"). Defendant argue that Plaintiffs have failed to plead facts "sufficient to establish" any of the elements of an aiding and abetting claim. (Joint Def. Mem. at 24.)

In the CCAC, Plaintiffs allege that:

Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of other Defendants' manipulations of natural gas and natural gas futures and option prices, including false reporting and wash sales, and willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts and options to reach artificial levels during the Class Period[.]

(CCAC ¶ 172.) The aiding and abetting claim also incorporates by reference all prior allegations in the complaint.

■ Defendants argue that Plaintiffs have failed to allege any facts showing that any specific Defendant had knowledge of any other Defendant's alleged violations of the CEA, they have failed to allege any

11. *See, e.g., Reddy v. CFTC*, 191 F.3d 109 (2d Cir.1999); *Transnor (Bermuda) Ltd. v. BP* *North America Petroleum*, 738 F.Supp. 1472, 1493 (S.D.N.Y.1990).

facts indicating that any Defendant shared any principal's unlawful intent, and they have failed to allege any facts indicating that any Defendant provided substantial assistance to any primary violator of the CEA.

In *766347 Ontario, Ltd. v. Zurich Capital Mkts.*, 249 F.Supp.2d 974, 990–91 (N.D.Ill.2003) (*"Zurich I"*), the court dismissed without prejudice a claim for aiding and abetting a CEA violation on the grounds that the plaintiffs had failed to allege in their complaint that the defendant had knowledge of the principals' intent to violate the CEA or that the defendant had acted in furtherance of a CEA violation. After the plaintiffs amended their complaint, the court denied a subsequent motion to dismiss the aiding and abetting claim in *Zurich II.* In their amended complaint, the plaintiffs in *Zurich II* had added an allegation that the defendant was aware that the relevant principals intended to and actually were violating the CEA, that the defendant encouraged that violation, and that the defendant intended to further the CEA violation. *Zurich II*, 274 F.Supp.2d at 935. The court found these amended allegations to be sufficient to withstand a motion to dismiss. *Id.*

Defendants here argue that the pleading of the aiding and abetting claim is deficient because it fails to allege that any specific Defendant knew that any other Defendant intended to violate the CEA. The CCAC alleges that

> Defendants were in regular and virtually continuous contact with one another, including regular and extremely frequent communications with respect to the spot price of natural gas and natural gas futures contracts. During these ongoing communications, Defendants worked to report misinformation and to create false impressions of trading activity, specifically intending to manipulate the

prices of natural gas futures and options to benefit their market positions to the detriment of other market participants. (CCAC ¶ 4.) When viewed in the light most favorable to Plaintiffs, as the Court must do at this stage of the litigation, this and other statements throughout the Complaints, supplemented by the information contained in the FERC Final Report and other documents incorporated into the Complaints, sufficiently allege an aiding and abetting claim to withstand a motion to dismiss.

### D. *STATUTE OF LIMITATIONS*

Finally, Defendants argue that the CEA's two-year statute of limitations, which provides that any private action for violation of the CEA "shall be brought not later than two years after the date the cause of action arises," bars Plaintiffs' claims. CEA § 22(c); 7 U.S.C. § 25(c). Plaintiffs filed their first complaint in this action on August 18, 2003 and seek recovery for activities that occurred as early as January 1, 2000.

■ A cause of action "arises" under the CEA when a party is placed on inquiry notice of the violation, or, in other words, "when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded." *Kolbeck v. LIT Am., Inc.*, 923 F.Supp. 557, 564 (S.D.N.Y.1996).

■ Plaintiffs assert that Defendants' fraudulent concealment of their allegedly unlawful activities should toll the statute of limitations. The statute of limitations for a violation of the CEA may be tolled if a plaintiff can show fraudulent concealment of the violation by a defendant. *See In re Issuer Plaintiff Initial Public Offering Antitrust Litig.*, No. 00 Civ. 7804, 2004 WL 487222 (S.D.N.Y. Mar, 12, 2004); *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181 (S.D.N.Y.2000). The doc-

trine of fraudulent concealment serves to "prevent a defendant from 'concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'" *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874)).

A plaintiff asserting fraudulent concealment as a reason to toll the applicable statute of limitations must show (1) that the defendant concealed the existence of the CEA violation; (2) that the plaintiff remained unaware of the violation during the limitations period; and (3) that the plaintiff's continuing ignorance as to the claim was not a result of a lack of due diligence. *See Issuer Plaintiff*, 2004 WL 487222, at *3; *Nine West*, 80 F.Supp.2d at 192. A plaintiff may show concealment "by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson*, 840 F.2d at 1083.

Plaintiffs assert that Defendants actively concealed their allegedly unlawful activities from the public, and they alternatively allege that those activities were self-concealing. Plaintiffs claim that they filed their initial complaint well within two years of when they could first be expected to have knowledge of those activities, which they identify as November 20, 2002. On that date, the Lieutenant Governor of California filed suit on behalf of California consumers against several defendants in this litigation for conspiring to report and publish false prices for natural gas in an effort to manipulate the price for natural gas in the physical market.

Among the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination, and that they engaged in fraudulent wash trades in part to present an appearance to the public of a greater demand for natural gas than actually existed. Such activities are inherently self-concealing. *See Hendrickson*, 840 F.2d at 1084; *In re Issuer Plaintiff*, 2004 WL 487222 at *4. Defendants argue that "Plaintiffs fail to allege how any Defendant, much less all of them, engaged in conduct to trick the Plaintiffs into overlooking what the Complaint alleges to be obvious price manipulation." (Joint Def. Mem. 26.) But Defendants misread the Plaintiffs' claims. It is not that Defendants allegedly took affirmative steps to prevent Plaintiffs from discovering their allegedly unlawful actions, but rather that the very actions that form the substance of Plaintiffs's complaint are by their nature designed to be concealed from the general public. In other words, there are no allegations that Defendants actively attempted to conceal their supposed reports of false trade data—instead, it is the claimed false trade reports themselves that provide the basis for the CEA violation.

Defendants argue that their alleged actions are not self-concealing, but provide no explanation for how their actions, if true, could or should have been discovered by the general public. Defendants fault Plaintiffs for providing no authority to support the assertion that the conduct allegedly engaged in by Defendants is self-concealing, but at the same time Defendants have emphasized the novelty of Plaintiffs' theory of their case. It is, therefore, no surprise that Plaintiffs cannot point to similar schemes to support the notion that such schemes are self-concealing.

■■ A plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment of a violation by a defendant ordinarily must meet the particularity

standard of Rule 9(b). *See Issuer Plaintiff,* 2004 WL 487222, at *3. When an alleged violation is inherently self-concealing, an assertion of such a scheme is sufficient and a plaintiff need not plead any affirmative actions by a defendant. *Id.* at *4; *Nine West Shoes,* 80 F.Supp.2d at 193.

To toll the statute of limitations because of fraudulent concealment, Plaintiffs must also allege the remaining two prongs of the fraudulent concealment test. *Issuer Plaintiff,* 2004 WL 487222 at *4. Here, Plaintiffs allege that they "had no knowledge of the unlawful conduct alleged in [the CCAC], or of any facts that could or would have led to the discovery thereof, until it became public" as a result of the lawsuit filed against several Defendants by the Lieutenant Governor of California on November 20, 2002. (CCAC ¶ 162.) The CCAC continues "[b]ecause the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in November 2002." (CCAC ¶ 163.)

In *Issuer Plaintiff,* the court examined a nearly identical allegation of fraudulent concealment and determined that such allegations at the very least presented a question of fact which could not be resolved at the motion to dismiss stage, and thus tolled the statute of limitations. *Id.* at *5. Indeed, several courts faced with allegations of fraudulent concealment have similarly held that whether a plaintiff was placed on inquiry notice for a cause of action raises a factual dispute that cannot be summarily resolved, though to be sure if facts in the complaint conclusively indicate that a plaintiff did or should have had knowledge of the violation within the statute of limitations, even when read in the light most favorable to the plaintiff, the limitations period should not be tolled.

*See In re Sumitomo Copper Litig.,* 120 F.Supp.2d 328, 346–47 (S.D.N.Y.2000); *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1408–09 (S.D.N.Y.1996).

■ Defendants attack Plaintiffs' professed due diligence, or at least the claim that Plaintiffs' failure to discover the alleged violations earlier was not due to a lack of due diligence. Defendants throw back at Plaintiffs their own words, as taken from the FERC Final Report, that "false price reporting was epidemic and done openly in the industry." (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss, dated May 19, 2004 (Plaintiffs' Mem.), at 40; FERC Final Report at ES–6.) Defendants argue that if the above allegation is true, then Plaintiffs cannot simultaneously excuse the expiration of the statute of limitations by claiming that they could not have learned of the alleged violations through due diligence. But there is a material difference between an allegedly unlawful practice being engaged in openly within the confines of an industry, and sufficiently widespread public knowledge outside of that industry that such a practice is performed within it.

E. *POTENTIAL LIABILITY OF PARENT CORPORATIONS*

Three Defendants, Cinergy, E1 Paso, and Encana, (the "Parent Defendants") have each moved separately for dismissal of the CCAC on the grounds that as merely parent companies, they cannot be liable for the activities of their respective subsidiaries, Cinergy Marketing and Trading LP ("CMT"); E1 Paso Merchant Energy LLP ("EPME"), and WD Energy Services, Inc. ("WD" and collectively with CMT and EPME, the "Subsidiary Defendants"). Parent Defendants argue that there is no suggestion in the CCAC that they were involved in the allegedly unlawful actions of the Subsidiary Defendants beyond

merely owning those entities, and therefore they cannot be held vicariously liable for the allegations against the Subsidiary Defendants in the complaint.

Under the CEA's section on principal liability:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B).

The definition of "person" for purposes of the CEA includes corporations. 7 U.S.C. § 1(a)(28). Plaintiffs rely on cases in which entities were held liable under the CEA for the actions of their individual employees when those employees were acting for their employers within the scope of their employment, regardless of the participation or direction of the employer, and Plaintiffs argue that the same standard applies to corporate subsidiaries and parents. *See Guttman v. CFTC*, 197 F.3d 33 (2d Cir.1999).

Parent Defendants argue that a different standard applies for holding a corporate parent liable for the actions of its corporate subsidiary. They correctly note that the general standard for piercing a corporate veil requires actual domination by the corporate parent over the corporate subsidiary, rather than mere ownership. *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69–70 (2d Cir.1996); *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir.1995).

Courts have described subsection 2(a)(1)(B) as codifying "a variant of the common law principle of respondeat superior" and thus "mak[ing] an employer strictly liable—that is to say, regardless of the presence or absence of fault on the employer's part—for torts committed by his employees in the furtherance of his business." *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986).

In a sense, both sides are correct in this dispute. Subsection 2(a)(1)(B) imposes the common law standards of respondeat superior liability on principals for the actions or inactions of their agents. But the Court cannot ignore the equally well-established principles limiting piercing a corporate veil. Plaintiffs have not identified, nor has the Court located, any case in which corporate parents were held liable for the actions of their corporate subsidiaries under § 2(a)(1)(B). Rather, it appears that § 2(a)(1)(B) has been used as the doctrine of respondeat superior has traditionally been applied—to hold employers liable for the wrongs of their employees in certain situations.

■ Some of this discussion is perhaps premature, for the CCAC suffers from a more fundamental defect regarding the Parent Defendants. The CCAC alleges, for example, that CMT "is a wholly owned subsidiary of Cinergy Corporation," (CCAC ¶ 34) and that Cinergy "wholly owns [CMT] and by virtue of its ownership controls [CMT]." (CCAC ¶ 35.) The CCAC later states that "the CFTC issued a subpoena to Cinergy seeking information about its trading practices, including the reporting for false and misleading energy prices to various indices," (CCAC ¶ 109) and that as a result of this subpoena, Cinergy terminated at least one employee. That is the full extent of the CCAC that specifically addresses Cinergy or CMT. Other than mere ownership of CMT, the CCAC contains no allegations of Cinergy's involvement in the alleged manipulation, let alone allegations of CMT's involvement beyond terminating an employee in response to an inquiry about CMT's trading practices. Such is not the stuff of an

adequate complaint as to Cinergy or CMT, even under the liberal notice pleading standards. Some more specific allegations must be made to state a claim as to either of those defendants.

By way of contrast, the CCAC alleges that Defendants Dynegy and West Coast Power "reported false natural gas trading information, that included price and volume information, to various indices" throughout much of the Class Period. (CCAC ¶ 75.) The CCAC continues that a FERC investigation "reported that Dynegy fabricated trades in its monthly reports to the indices to come to a predetermined average" and that Dynegy traders were "told to make the volume 2 or 3 times greater and make the price range higher" when reporting their trades. (CCAC ¶ 77.) Additionally, the CCAC alleges that Dynegy "caused West, as a result of its ownership interest and control, to submit false information that West was counterparty to the fabricated trades." (CCAC ¶ 78.) The allegations against Cinergy and CMT, in comparison, simply fail to state a claim or provide notice of Plaintiffs' claims to those Defendants, nor can the catch-all allegations against all Defendants save the Plaintiffs' claims as to Cinergy and CMT.

The CCAC is similarly so lacking in detail against Encana that the Court must grant Encana's motion to dismiss. Encana receives even less specific attention in the CCAC than Cinergy or CMT. The CCAC alleges that Encana is a Canadian corporation that "wholly owns [WD] and by virtue of its ownership controls [WD]." That alone cannot serve to establish Encana's liability for the alleged acts of WD. Moreover, the last specific allegation in the CCAC directed to Encana, that "Encana has settled with the CFTC in connection with the manipulation of natural gas

prices, including false reporting," (CCAC ¶ 41) plainly misrepresents the settlement, as Encana argues and as Plaintiffs appear to recognize in their opposition when they recharacterize the settlement as: "Encana agreed to the entry of the CFTC order against [WD]." (Plaintiffs' Mem. at 49.) The CFTC WD Order [12] makes no mention of any potential CEA violations by Encana, and Plaintiffs do not put forth any allegations beyond mere ownership to support Encana's liability for WD's alleged violations.

Finally, the CCAC alleges that El Paso "wholly owns [EPME] and by virtue of its ownership controls [EPME]. During the Class Period, it was [EPME's] primary purpose to conduct El Paso's marketing and trading of natural gas." (CCAC ¶ 28.) Additionally, the CCAC asserts that during the Class Period, "it was [EPME's] function to conduct El Paso Corporation's marketing and trading of natural gas and power generation." (CCAC ¶ 27.) These allegations, like those against Encana and Cinergy, fail to adequately state a claim against El Paso. The CCAC lists sufficiently detailed allegations against EPME, including assertions that during the Class Period EPME "reported false natural gas trade data, which included price and volume information, to certain indices," (¶ 97) and that EPME "false reported artificial trade data to financially benefit its trading positions and to manipulate the natural gas market." (CCAC ¶ 98.) But the CCAC makes no similar allegations against El Paso, nor does it indicate El Paso's involvement in the actions allegedly undertaken by EPME beyond mere ownership. As written, the CCAC does not state a claim against El Paso.

---

12. *In re WD Energy Servs. Inc.,* Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act,

Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 03–20, dated July 28, 2003 (the "CFTC WD Order").

## F. *JURISDICTION OVER MIDAMERICAN ENERGY COMPANY*

■ Defendant MidAmerican Energy Company ("MidAmerican") separately moves to dismiss the complaint against it for lack of personal jurisdiction. The CEA provides that a plaintiff may bring a private right of action for a violation "in any judicial district wherein the defendant is found, resides, or transacts business, or in the judicial district wherein any act or transaction constituting the violation occurs." 7 U.S.C. § 25(c).

MidAmerican argues that as an Iowa-based public utility that does not provide services to any customer in New York, has no offices or employees in New York, is not licensed to do business in New York, and who allegedly made wash trades through a Texas-based internet system for natural gas stored in Louisiana, this Court has no personal jurisdiction over it.

MidAmerican takes too narrow a view of Plaintiffs' allegations against it. The manipulation claim and the aiding and abetting claim are both grounded in New York. Plaintiffs' overall theory of manipulation is that Defendants, including MidAmerican, reported fraudulent trade data, engaged in wash sales, or both, with the purpose of manipulating the market for natural gas futures on the *New York* Mercantile Exchange. The alleged substantive violation of the CEA occurred in New York, not Louisiana or Texas or Iowa. Contrary to MidAmerican's argument, it is irrelevant that the alleged wash trades themselves were not consummated over a New York-based exchange. The Court concludes that it has personal jurisdiction over MidAmerican.

## G. *CORAL ENERGY*

Coral Energy Resources, L.P. and Coral Energy Holding, L.P. (the "Coral Parties") have together filed a motion to dismiss the CCAC against them for failure to state a claim.

The CCAC alleges that an entity identified as "Coral Energy," which apparently refers to Coral Energy Resources, L.P., engaged in a practice known as survey reporting, in which it "reported trades it observed or heard about, frequently and knowingly misrepresenting them as its own, which manipulated the published price indices." (CCAC ¶ 105.) The CCAC then quotes from the FERC Final Report, which states that "Coral does not address the seemingly obvious problem with reporting prices and volumes of trades that traders had 'heard about' or 'seen on electronic trading platform.'" (CCAC ¶ 106; FERC Final Report at III–22.)

In their separate motion to dismiss, the Coral Parties essentially rehash the arguments made in the Joint Def. Memo. by stating that Plaintiffs fail to allege the elements of a manipulation claim or an aiding and abetting claim. The Court has already considered and rejected this argument and will not repeat its reasoning here.

The Coral Parties also argue that the CCAC's scant specific references to them fail to state a claim against them for manipulation or aiding or abetting a violation of the CEA. The Court agrees that the CCAC as written fails to state a claim against the Coral Parties. The allegations as set forth in the CCAC against the Coral Parties, if true, simply cannot rise to the level of manipulation or aiding and abetting under the CEA. The Court also notes that the Coral Parties have apparently not been fined by the FERC or CFTC for any violations of the CEA. Accordingly, the Court grants the motion of the Coral Parties to dismiss the CCAC against them.

## H. *CALPINE ENERGY SERVICES*

Defendant Calpine Energy Services, L.P. ("Calpine") filed a separate motion to

dismiss the RCAC against it on the grounds that the RCAC fails to sufficiently allege any CEA violation against it, and because Plaintiffs fail to allege that they were in privity with Calpine.

 The RCAC alleges that Calpine "manipulated the natural gas market by manipulating natural gas spot prices and NYMEX natural gas futures prices [during the Class Period] by falsely reporting natural gas price and volume information to the various indices." (RCAC ¶ 147.) The RCAC also alleges that Calpine "carried out its manipulation of natural gas futures contracts prices through participation in wash trades and market gaming strategies on EOL for the purpose of manipulating higher natural gas futures prices," and that "on September 27, 2001, Calpine engaged in three wash trading transactions during Choice Markets on the EOL system." (RCAC ¶¶ 148–49.)

As noted in the RCAC, Calpine entered into a $1.5 million settlement with the CFTC regarding violations of the CEA. Although the settlement makes clear that Calpine was not admitting or denying the CFTC's allegations by entering into the settlement, and that the CFTC's findings are not binding on any other entity, the settlement agreement states that between September 2001 and October 2002, Calpine "reported false information, including price and volume information, concerning natural gas cash transactions to certain reporting firms." (*In re Calpine Energy Servs., L.P.*, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 04–11, dated Jan. 28, 2004 (the "CFTC Calpine Settlement"), attached as Exhibit A to Defendant Calpine Energy Services, L.P.'s Memorandum of Law in Support of its Motion To Dismiss the Complaint Pursuant to FRCP Rule 12(b)(6).)

Calpine emphasizes that the CFTC Calpine Settlement indicates that only one Calpine trader, out of approximately fifty traders with the company, knowingly reported false trades, and that Calpine's $1.5 million fine was the lowest settlement reached so far by any Defendant with the CFTC. Calpine argues that these two facts cannot support Plaintiffs' claims of CEA violations against it for manipulation or aiding and abetting manipulation. But Calpine's arguments miss the mark here. The CFTC Calpine Settlement may be low as far as the settlement figures in these proceedings go, and it may be that, should this matter proceed to summary judgment or trial, Calpine could have a valid defense against Plaintiffs' allegations. But given that Calpine already settled a complaint against it filed by the CFTC for essentially the same conduct that appears in the RCAC, and that the CFTC Calpine Settlement is referenced in the RCAC, it defies logic to argue that the RCAC is so lacking in the sufficiency of its allegations that there is no possible set of facts that the Plaintiffs could prove to recover on their claims or that the RCAC fails to provide Calpine with notice of the claims against it.

Calpine also argues that Plaintiffs' failure to allege privity as, Calpine claims, the CEA requires, is a fatal defect in the RCAC. As discussed above in relation to the Wash Trading Defendants (see *supra* III.B.), § 22(a) of the CEA, 7 U.S.C. § 25(a), delineates the four conditions under which a private party may file suit under the CEA. It is undisputed that the first three avenues to a private right of action are unavailable to Plaintiffs, because they require a degree of privity between the litigants absent here. *See* 7 U.S.C. §§ 25(a)(1)(A)—(C). All attention must turn to subparagraph 25(a)(1)(D), which provides for a private right of action for CEA violations to any would-be litigant "who purchased or sold a contract referred

to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract."

Calpine reads subparagraphs (D) and (B) together to find a privity requirement. Subparagraph (B) provides that any person (including corporations) who violates the CEA may be open to suit from any person "who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract." Calpine's argument that subparagraph (D) requires privity stems from the requirement in subparagraph (D) that to file suit a plaintiff must have "purchased or sold a contract referred to in subparagraph (B)." Continuing that line of thought, Calpine then reads the full requirements of subparagraph (B) into subparagraph (D) and asserts that for a plaintiff to sue under subparagraph (D), the contracts in subparagraph (B)—a "contract of sale of any commodity for future delivery (or option on such contract or any commodity)"—must be "made through such person," i.e., the defendant. Because Calpine and Plaintiffs never dealt directly with each other, but rather apparently dealt in entirely different markets, Calpine argues that there is no privity and thus it cannot be subject to suit by Plaintiffs.

The Court is unwilling to read in a privity requirement into subparagraph (D). Subparagraph (D) incorporates *contracts* referred to in subparagraph (B). The contract referred to in subparagraph (B) is a "contract of sale of any commodity for future delivery (or option on such contract or any commodity)." The contract is distinct from the parties to it.

No court has apparently ever interpreted subparagraph (D) to impose a privity requirement on potential plaintiffs, and Calpine cites no support for its interpretation of the statute as requiring privity. The court in *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1042 (S.D.N.Y.1993), discussed subparagraph (D)'s preconditions to suit without any mention of privity, despite the absence of privity between the parties. Rather, the court in *Three Crown* interpreted subparagraph (D) as this Court does: it allows for a private right of action if a plaintiff alleges that "defendants violated the CEA by manipulating the price of a futures contract purchased or sold by plaintiffs, or by manipulating the price of a commodity underlying that futures contract." *Id.* The Court also notes that the Joint Def. Memo., to which Calpine is a signatory, takes the position as to the so-called "Wash Trading Claim" that subparagraphs (A) through (C) of 7 U.S.C. § 25(a)(1) require privity and therefore Plaintiffs are limited to bringing such a claim under subparagraph (D), which they then challenge for other reasons. (*See* Joint Def. Mem. at 19.)

Accordingly, the Court denies Defendant Calpine's motion to dismiss the RCAC as to it.

## I. *E-PRIME*

Like many of the other CCAC and RCAC Defendants, e-prime Inc. ("e-prime") argues that the RCAC fails to state a claim against it, even if the Complaints do state a claim against other Defendants. Repeating the same arguments of its co-Defendants, e-prime argues that Plaintiffs have failed to state a claim because they have failed to plead adequately facts establishing the elements of a manipulation or aiding and abetting claim.

 The RCAC alleges that during most of the Class Period, e-prime "reported trades that did not occur and reported

false natural gas data including price and volume information using telephones and via electronic mail" and that e-prime did so "in an attempt to skew the indices to benefit its own trading positions." (RCAC ¶¶ 132–33.) Additionally, the RCAC refers to a settlement with the CFTC on January 28, 2004 by which e-prime agreed to pay $16 million to resolve—without admitting or denying—a CFTC administrative proceeding in which the CFTC found that e-prime made false trade reports to reporting firms in an effort to alter the indices, and that false price and volume trade information tends to affect the futures prices of natural gas on the NYMEX.

The Court recognizes that this settlement, like most of the other settlements that Defendants have entered into with the CFTC, does not contain any admission of wrongdoing by the e-prime and is not necessarily evidence that e-prime manipulated the NYMEX natural gas futures despite reporting false information in the physical market. But for largely the same reasons the Court has already expressed as to other Defendants making similar arguments after having already paid millions of dollars to settle government administrative proceedings arising from the same activities, the Court denies e-prime's motion to dismiss. E-prime cannot legitimately argue that Plaintiffs, after conducting discovery, can come forward with no set of facts by which they could prove their claims as set forth in the RCAC and obtain relief, or that the RCAC provides insufficient notice to e-prime of the claims against it.

Accordingly, the Court denies e-prime's motion to dismiss the RCAC.

## J. ONEOK ENERGY AND MARKETING CO., L.P. AND ONEOK, INC.

In their separate motion to dismiss the RCAC, Oneok Energy and Marketing Co., L.P. and Oneok, Inc. (the "Oneok Parties") assert that Plaintiffs added them to this lawsuit "based on nothing other than the fact that they settled a matter with the CFTC in which the CFTC found that they had provided false and/or misleading information to publications that produce pricing information for the energy markets." (Memorandum of Law in Support of the Motion To Dismiss of Oneok Energy and Marketing Co., L.P. and Oneok, Inc., dated March 29, 2004, (the "Oneok Memo.") at 3.) The Oneok Parties correctly note that nothing in their combined $3 million settlement with the CFTC expressly states that they even attempted to manipulate the NYMEX natural gas futures market.

The RCAC's allegations against the Oneok Parties are essentially the same as against many of the other Defendants who have entered into settlements with the CFTC, *i.e.* that the Oneok Parties reported false trade data to reporting agencies, manipulated natural gas spot and futures prices, and settled with the CFTC to avoid an administrative proceeding involving these activities. (RCAC ¶¶ 137–41.) The Oneok Parties' arguments in favor of dismissal are likewise similar to the arguments advanced by their co-Defendants: that the RCAC fails to allege sufficient facts to state a claim and fails to adequately allege the elements of manipulation or aiding and abetting. In light of the Court's treatment of the motions of their co-Defendants raising similar arguments in the face of similar allegations, the Court will endeavor to preserve some of the few trees that have managed to survive the first round of briefing in this litigation and merely say that for the same reasons as previously stated, the Oneok Parties' motion to dismiss the RCAC against them is denied.

## K. RELIANT

The final motion before the Court is that of Defendant Reliant Energy Ser-

vices ("Reliant") to dismiss Plaintiffs' claims against it. Reliant argues that Plaintiffs' allegations of churning are preempted by the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (the "NGA"), that the FERC has exclusive jurisdiction over the churning allegations, and that the claims should be dismissed because the FERC has investigated these same activities and concluded that Reliant did not violate either the NGA or the FERC's own regulations.

Plaintiffs allege that Reliant manipulated the price of natural gas futures contracts by engaging in what they term "churning" in the spot gas market at Topock, Arizona, where several gas pipelines connect on the Arizona–California border. Essentially, the churning allegations revolve around trading activity in which Reliant engaged in a series of extremely frequent, rapid-fire purchases of large amounts of gas during the course of several hours on different days over the EOL trading platform. Because Reliant traded very substantial volumes of gas—apparently far more than it needed—and because no party in the spot market other than Enron was aware that the very sizable trading volume was all being performed by Reliant, the price of natural gas in the spot market at Topock rose due to the apparent dramatic increase in demand. Reliant then sold at the higher price most of the gas it had purchased throughout the price buildup. This activity enabled Reliant to reap a profit on its trades despite being a net purchaser of gas over the span of this "churning" activity.

In investigating this trading activity, the FERC determined that the price of natural gas in the spot market at Topock on days Reliant engaged in this trading activity was, on average, $9/MMBtu[13] higher than when Reliant did not engage in churning. (FERC Final Report at II–58.)

Plaintiffs' allegations are taken from the FERC Final Report. A chart in the CCAC identifies the dates on which Plaintiffs claim Reliant engaged in churning and lists the amounts of gas Reliant purchased and sold on those dates. (CCAC ¶ 151.) Plaintiffs claim that by engaging in churning at Topock, Reliant manipulated NYMEX natural gas futures contracts.

Reliant launches a multi-pronged attack on the CCAC. It asserts that the churning activity Plaintiffs allege falls exclusively under the jurisdiction of the FERC via the NGA. Alternatively, Reliant insists that Plaintiffs fail to state a claim against it under the CEA.

By its terms, the NGA applies to "transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). The Supreme Court has characterized the NGA as a " 'comprehensive scheme of federal regulation of all wholesales of natural gas in interstate commerce' [which] confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (quoting *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas,* 372 U.S. 84, 91, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963)).

The CEA expressly states that it should not be interpreted to "supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Ex-

---

**13.** One MMBtu represents one million British Thermal Units, a measure of energy.

change Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A).

Reliant argues that the FERC has exclusive jurisdiction over the claims against it here because those claims relate only to wholesale trades of gas in the physical market. Plaintiffs counter that because natural gas is a commodity and the CEA prohibits the manipulation of the price of any commodity, Plaintiffs can bring a claim under the CEA against Reliant for the alleged conduct. Plaintiffs argue that the Supreme Court's characterization of the NGA in *Schneidewind* as conferring exclusive jurisdiction for wholesale trades of natural gas in interstate commerce upon the FERC must be read in light of the context of that case, in which the Court was asked to determine whether state utility commissions could regulate natural gas companies or whether the NGA preempted state jurisdiction. Plaintiffs emphasize that the Court was focused on state versus federal jurisdiction, rather than the potential jurisdiction of different federal regulatory agencies.

For now, the Court will avoid delving too deeply into an analysis of the jurisdictions of competing and overlapping federal regulatory commissions. The FERC Final Report devotes 61 pages to the activities of Reliant alleged here, and makes no mention of the NYMEX futures market for natural gas. Moreover, the FERC Final Report concluded that Reliant's "churning" trades at Topock were *not* prohibited. On October 2, 2003, the FERC entered into an Order Approving Stipulation and Consent Agreement with Reliant (the "FERC Reliant Agreement," *available at* 2003 WL 22273230 (F.E.R.C.)). The FERC Reliant Agreement stated that it resolved several outstanding FERC investigations into alleged misbehavior by Reliant, including the Topock conduct addressed in the

FERC Final Report. The FERC Reliant Agreement imposed no fine on Reliant for the Topock conduct, and expressly stated that the FERC's investigation into that conduct "found no evidence that Reliant or Reliant's trader intended to manipulate gas prices. Reliant's trading activity was an attempt to obtain gas at the lowest possible price." (FERC Reliant Agreement ¶ 17.) The FERC Reliant Agreement also provided that "the [FERC] agrees with the [FERC Final Report] that Reliant's trading activity at Topock did not violate either the [NGA] or the [FERC's] regulations." (FERC Reliant Agreement ¶ 28.)

Theoretically, Plaintiffs may assert a claim against Reliant under the CEA for manipulation of NYMEX gas futures contracts based on the conduct alleged here. Although the underlying trades at issue occurred only in the physical market, the substance of Plaintiffs' claims focuses on the effect of that activity on the futures market, which falls within the realm of the CEA. Section 22 of the CEA provides to any person who purchases or sells a futures contract a private right of action for any violation of the CEA, "if the violation constitutes a manipulation of the price of any such contract *or the price of the commodity underlying such contract.*" 7 U.S.C. § 25(a)(1)(D) (emphasis added). The NGA and the CEA address different, though at times related, spheres. Whereas the NGA aims to protect the public interest in the interstate transport and sale of natural gas destined for distribution to the general public, *see* 15 U.S.C. § 717(a), the CEA safeguards the public interest in the integrity of the commodity futures markets. *See* 7 U.S.C. § 5.

██ The Court recognizes that the allegations of Plaintiffs' claim against Reliant are based entirely on the FERC report, which concluded that Reliant did no

legal wrong. Thus, the regulatory commission charged with investigating Reliant's underlying conduct found no punishable wrongdoing, but Plaintiffs nevertheless point to that investigation as the basis for other allegations of misbehavior. While the Court is mindful of the conceptual hurdles underlying Plaintiffs' theory, *see In re Livent, Inc. Noteholders Secs. Litig.*, 151 F.Supp.2d 371, 406 (S.D.N.Y.2001) (noting that "a court need not feel constrained to accept as truth ... pleadings ... that are contradicted ... by documents upon which its pleadings rely, or by facts of which the court may take judicial notice"), it cannot dismiss the claim at this stage. Doing so would effectively amount to uncritically endorsing the FERC's interpretation of the statute or giving its proceedings *res judicata* effect. While the Court is obliged to give a great degree of deference to the findings or statutory interpretation of an agency, it is not bound to rubber stamp them, or give them effect prematurely in subsequent civil proceedings. *See Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983) ("while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, ... they must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'") (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)); *American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 317, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) ("[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia"). Accordingly, the Court will deny the motion of Defendant Reliant Energy Services to dismiss the Complaint as to it.

## L. *LEAVE TO AMEND*

Finally, the Court must consider the ultimate effect of granting several of Defendants' motions to dismiss. Plaintiffs have not yet amended their Complaints and request leave to do so in the event the Court grants any of Defendants' motions. It is well established that leave to amend a complaint "shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). Moreover, the Second Circuit has noted that "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). The Court sees no valid reason to deny Plaintiffs' request to amend here and therefore will treat all the motions to dismiss granted in this Decision and Order as being without prejudice.

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the joint motion of all defendants in the consolidated cases 03 Civ. 6186, 03 Civ. 7750, 03 Civ. 8320, 03 Civ. 9039, and 04 Civ. 758 to dismiss the consolidated class action complaint (the "CCAC") is denied; and it is further

**ORDERED** that the motions of defendants Cinergy Corporation, Encana Corporation, and El Paso Corporation to dismiss the CCAC are granted without prejudice, provided that any motion to amend the Complaints in this regard shall be filed within twenty (20) days of the date of this order; and it is further

**ORDERED** that the motion of defendant MidAmerican Energy Company to dismiss the CCAC is denied; and it is further

**ORDERED** that the motion of defendants Coral Energy Holding LP and Coral Energy Resources, LP to dismiss the

CCAC is granted without prejudice, provided that any motion to amend the Complaints in this regard shall be filed within twenty (20) days of the date of this order; and it is further

**ORDERED** that the motion of defendant Calpine Energy Services, LP to dismiss the related Class Action Complaint in 04 Civ. 0758 (the "RCAC") is denied; and it is further

**ORDERED** that the motion of defendant e-prime Inc. to dismiss the RCAC is denied; and it is further

**ORDERED** that the motion of defendants Oneok Energy and Marketing Co., L.P. and Oneok, Inc. to dismiss the RCAC is denied; and it is further

**ORDERED** that the motion of defendant Reliant Energy Services, Inc. to dismiss the CCAC is denied.

A conference will be scheduled before the Court upon completion of the pretrial matters that have been referred to the designated Magistrate Judge.

**SO ORDERED.**