**U.S. COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**AMARANTH ADVISORS, L.L.C., Amaranth Advisors (Calgary) ULC, and Brian Hunter, Defendants.**

**No. 07 Civ. 6682 (DC).**

United States District Court, S.D. New York.

May 21, 2008.

Decision Denying Reconsideration June 10, 2008.

Terry Arbit, Esq., by Stephen Jay Obie, Esq., David W. MacGregor, Esq., Manal Sultan, Esq., Elizabeth C. Brennan, Esq., David W. Oakland, Esq., Karin N. Roth, Esq., W. Derek Shakabpa, Esq., New York, NY, for the U.S. Commodity Futures Trading Commission.

Winston & Strawn LLP, by David E. Mollon, Esq., Steven M. Schwartz, Esq., Lauren B. Lepore, Esq., New York, NY, for Defendants Amaranth Advisors, L.L.C. and Amaranth Advisors (Calgary) ULC.

Kobre & Kim LLP, by Michael S. Kim, Esq., Leif T. Simonson, Esq., New York, NY, for Defendant Brian Hunter.

## OPINION

CHIN, District Judge.

The U.S. Commodity Futures Trading Commission (the "CFTC") brings this action against defendants Amaranth Advisers, L.L.C. ("Amaranth Advisors"), Amaranth Advisors (Calgary) ULC ("Amaranth Calgary"; together, "Amaranth"), and Brian Hunter under the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 1 *et seq.* The CFTC alleges that defendants attempted to manipulate the price of natural gas futures contracts by deliberately waiting to sell a substantial number of those contracts in the final minutes before the close of trading. Amaranth also purportedly attempted to "cover up" the alleged manipulative scheme by submitting false statements to the New York Mercantile Exchange ("NYMEX").

Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). They argue, among other things, that the CFTC is seeking to "transform legitimate speculative trading" into a violation of the CEA. They also contend that they did not conduct the trades in question with the intent to manipulate prices. In addition, Hunter—a Canadian citizen, residing in Canada, and working for a Canadian company when he made the trades at issue in this case—moves to dismiss for lack of personal jurisdiction.

For the reasons that follow, defendants' motions to dismiss are denied.

## BACKGROUND

### A. The Facts

As alleged in the complaint, the facts are as follows:

### 1. The Parties

The CFTC is an independent federal regulatory agency charged with administering and enforcing the CEA. (Compl. ¶ 9).

Amaranth Advisors was a hedge fund, incorporated in Delaware, with its principal place of business in Greenwich, Con-

necticut, until its collapse in September 2006. (*Id.* ¶ 10). *See U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.,* 523 F.Supp.2d 328 (S.D.N.Y.2007). It had owned 99 percent of Amaranth Calgary, a Nova Scotia company based in Calgary, Canada. (Compl. ¶¶ 11, 12).

Hunter was in charge of the natural gas trading at Amaranth. (*Id.* ¶¶ 20, 22). In October 2005, he became the president of Amaranth Calgary and transferred from Greenwich to Calgary. (*Id.* ¶¶ 14, 20). While at Amaranth Calgary, Hunter continued to supervise natural gas traders working at the Greenwich office. (*Id.*). Hunter was in Calgary when he executed the trades on NYMEX that are at issue in the instant case. (*See id.* ¶¶ 8, 14, 20; *see also* Hunter Mem. at 3).

### 2. *Commodity Futures Markets*

Defendants traded natural gas futures contracts, which are standardized agreements "to purchase or sell a commodity for delivery in the future" at a pre-determined price. (*Id.* ¶ 16). The buyer, who is obligated to accept delivery of the commodity, is called the "long" and is said to hold a "long position" on a futures contract.[1] The party selling the commodity, and thus the party obligated to deliver the commodity on the delivery date, is the "short" and holds a "short position" on the futures contract. Because all futures contracts are standardized except for the price, a party holding one position on a futures contract may cancel its obligation by acquiring an equal and opposite position in a corresponding contract. Any difference between the price of the initial contract and the offsetting contract is the profit or loss on the contract.

Amaranth was not capable of delivering or accepting the delivery of physical natural gas, so it needed to have a "flat position" at the close of trading for a given contract (*id.* ¶ 19), meaning that it needed to offset any short or long position prior to the expiration of a contract or roll its position over to the following month (Amaranth Mem. at 4).

Futures contracts are bought and sold on futures or commodity exchanges, such as NYMEX. (Compl. ¶ 18). NYMEX trades futures contracts for, among other things, the delivery of natural gas at the Henry Hub in Louisiana for the present calendar month and for each of the next 72 consecutive months. (*Id.* ¶ 17). Contracts expire on the third to last business day of the month prior to which delivery must be made on open contracts (the "expiration day"). (Amaranth Mem. at 4). For instance, for the March 2006 natural gas futures, the expiration day was February 24, 2006. Any net contract positions left open at expiration must be settled through physical delivery. (*Id.*). Pursuant to NYMEX rules, the settlement price for natural gas futures is based on "the volume weighted average of trades executed from 2:00–2:30 p.m. ('closing range')" on expiration day. (Compl. ¶ 25).

### 3. *Swaps Markets*

Defendants also traded over-the-counter ("OTC")[2] natural gas swaps, which are

---

1. The explanations of futures contracts and commodities markets come from *In re Natural Gas Commodity Litigation,* 337 F.Supp.2d 498, 502 (S.D.N.Y.2004). For additional explanations, see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and *In re Soybean Futures Litigation,* 892 F.Supp. 1025 (N.D.Ill.1995).

2. "Over the counter" refers to the "trading of commodities, contracts, or other instruments not listed on any exchange." (CFTC Glossary, http://www.cftc.gov/educationcenter/glossary (last visited May 13, 2008)). "At one time completely unorganized, the over-the-counter market is now relatively organized with computerized quotation and transaction

different financial instruments from futures contracts and exchanged in commercial markets, such as the IntercontinentalExchange ("ICE"). (*Id.* ¶ 18). In general, swaps refer to the "the exchange of one asset or liability for a similar asset or liability." (CFTC Glossary). Commodity swaps, more specifically, are swaps "in which the payout to at least one counterparty is based on the price of a commodity or the level of a commodity index." (*Id.*). ICE, for instance, uses the NYMEX settlement price of natural gas futures to calculate the settlement price of natural gas swaps. (Compl. ¶ 29).

On the days when defendants purportedly attempted to manipulate the prices of natural gas futures, they held large short positions on natural gas swaps. (*Id.* ¶¶ 30, 41, 47).

### 4. *The Alleged Manipulative Scheme*

The NYMEX trades in question were made on February 24 and April 26, 2006.

#### a. *The February 24, 2006 Trades*

On February 23, 2006, Hunter told an Amaranth natural gas trader, Matthew Donohoe, to "make sure we have lots of futures to sell MoC [market on close][3] tomorrow." (*Id.* ¶ 32). When trading commenced on February 24, the expiration day for the March 2006 natural gas futures, Amaranth had a short position in more than 1,700 contracts. (*Id.* ¶ 33). But by the start of the closing range, defendants had reversed their position to long in more than 3,000 contracts. (*Id.* ¶ 35).

At about 12:15 p.m. on February 24, Hunter sent an instant message to Amaranth trader Matthew Calhoun, stating that the March 2006 contracts needed "to get smashed[4] on settle then day is done." (*Id.*

¶ 36, Ex. A at AALLC_REG0684186). Less than half an hour before the closing range, Hunter disclosed his trading strategy to another trader, who expressed astonishment that Hunter had so many March 2006 contracts left to sell:

Hunter:  We have 4000 to sell MoC

Hunter:  shhhh

gloverb:  come on

Hunter:  y

gloverb:  unless you are huge bearish

gloverb:  position

gloverb:  why the f would y[ou] do that

Hunter:  all from options yest[e]rday

Hunter:  so we[']ll see what the floor has

Hunter:  bit of an exp[e]riment mainly

gloverb:  what the f

gloverb:  that is huge

(*Id.* ¶ 38). At about 2:11 p.m., Hunter sent another message to "gloverb," stating that he had "alot [sic] more to sell . . . waiting until 2:20." (*Id.* ¶ 39).

On February 24, defendants sold more than 3,000 March 2006 contracts during the closing range. (*Id.* ¶ 41).

#### b. *The April 26, 2006 Trades*

From April 21 to April 26, defendants began acquiring May 2006 contracts so that by the closing range on April 26, the expiration day for the May 2006 contracts, they held a long position in more than 3,000 May 2006 contracts. (*Id.* ¶¶ 45, 46).

At the beginning of the closing range on April 26, Hunter sent Calhoun an instant message, stating that he was " 'wa[i]ting to sell.' " (*Id.* ¶ 53). Also early in the closing range, Hunter told an Amaranth risk manager that he had " 'yet to sell,' " despite

---

reporting services." *Black's Law Dictionary* 1105 (6th ed. 1990).

**3.** A "market on close" order is an "order to buy or sell at the end of the trading session at

a price within the closing range of prices." (CFTC Glossary).

**4.** "Smashed" refers to prices that fall very quickly. (Compl. ¶ 37).

the presence of many buyers. (*Id.* ¶ 52). He was mainly referring to the hedge fund Centaurus Advisors LLC ("Centaurus"). (*Id.* ¶ 48). Hunter believed that Centaurus was planning to purchase a large number of May 2006 natural gas futures in the closing range, which "would tend to exert upward price pressures." (*Id.* ¶¶ 48, 54). In several instant messages, Hunter expressed concern that Centaurus's purchases would affect the settlement price:

Hunter: FYI Arnold [a trader at Centaurus] is getting scary short …

Chasman: what u think arnold has?

Hunter we are rolling size into may

Hunter: and I am worrie[d] that [Arnold] has taken the other side of everything

(*Id.* ¶¶ 49–50). Hunter knew that selling his May 2006 contracts would "mute the effect of the buyers." (*Id.* ¶ 54).

Halfway into the closing range, defendants placed two different orders to sell their May 2006 contracts, but with instructions to hold the execution of the orders until the last eight minutes of the closing range. (*Id.* ¶¶ 55–58). At 2:22 p.m., with only eight minutes left before the close of trading, defendants placed a third order to sell 2,000 May 2006 contracts, which comprised two-thirds of the long position Amaranth had going into the closing range. (*Id.* ¶ 59). The last order was "so large, and came so late in the closing range, that the broker was not able to execute the entire order," and only 1,675 of the contracts were sold before the close of trading. (*Id.* ¶¶ 60–61).

#### c. *Marking the Close*

Defendants' trading strategy of purchasing a substantial number of futures contracts leading up to the closing range on expiration day, followed by the sale of those contracts several minutes before the close of trading, is known as "marking the close." *See Sec. & Exch. Comm'n v. Masri,* 523 F.Supp.2d 361, 369–70 (S.D.N.Y.

2007). This type of trading strategy, conducted "at or near the close of trading for the primary purpose of attempting to change the closing price," was specifically prohibited in a compliance manual issued by Amaranth Calgary on March 10, 2006. (Compl. ¶ 42–43).

#### d. *Defendants' Motives*

Defendants had at least two motives for attempting to manipulate natural gas futures prices. First, defendants were trying to "mute the effect" of Centaurus's large purchases of the May 2006 natural gas futures. (*Id.* ¶¶ 48–54; *see also* CFTC Mem. at 10). Second, and ultimately, defendants sought to profit from their large short positions on natural gas swaps, the prices of which depended on the closing price of natural gas futures. (Compl. ¶¶ 30, 41, 47). On February 24, it had a short position in at least 12,000 swaps (*id.* ¶ 41), and on April 26, it had a short position in more than 19,000 swaps (*id.* ¶ 47). A low settlement price of natural gas futures would have benefitted these short positions. (*Id.* ¶ 28).

### 5. *The Cover Up*

In a letter dated August 2, 2006, the NYMEX Compliance Department informed Amaranth that it had commenced an investigation into Amaranth's April 26 trading activities. (*Id.* ¶ 63, Ex. B). The letter noted that Amaranth sold 99 percent of its contracts during the final four minutes of regular trading hours, and 75 percent of its contracts in the final minute. (*Id.* Ex. B). NYMEX asked Amaranth to submit a written explanation "of the commercial need and justification for their trading." (*Id.*).

Amaranth responded in a letter dated August 15, 2006. (*Id.* Ex. C). This letter "contain[ed] a number of false and misleading statements, including the manner in which Amaranth described its positions

and trading strategy." (*Id.* ¶ 68). Specifically, Amaranth "deliberately" concealed that it had "given specific instructions to its floor brokers on April 26, 2006 as to when Amaranth's sales orders should be executed, claiming [instead] that it did not decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later." (*Id.* ¶¶ 68, 80).

## B. *Procedural History*

After a year-long administrative investigation, the CFTC commenced this action on July 25, 2007, asserting two causes of action: an attempted manipulation claim under sections 6(c), 6(d), and 9(a)(2) of the CEA, and a cover-up claim under section 9(a)(4) of the CEA. 7 U.S.C. §§ 9, 13b, 13(a)(2), 13(a)(4). Section 6c of the CEA authorizes the CFTC to seek civil monetary penalties and injunctive relief "[w]henever it shall appear to the [CFTC] that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision" of the CEA. § 13a–1.

All defendants waived service of summons. They now move to dismiss the complaint for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). Hunter also moves to dismiss for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(2).

## *DISCUSSION*

■ First, I address whether this Court has personal jurisdiction over Hunter. Second, I address the attempted manipulation claim. Third, I address the cover-up claim against Amaranth.

## A. *Personal Jurisdiction Over Hunter*

### 1. *Applicable Law*

For cases arising under federal law that involve a defendant residing outside the forum state, the district court applies the personal jurisdiction rules of the state in which it sits unless the federal statute explicitly provides for nationwide service of process. *Pacific Elec. Wire & Cable Co. v. Set Top Int'l, Inc.*, No. 03 Civ. 9623(JFK), 2005 WL 578916, at *8 (S.D.N.Y. Mar. 11, 2005) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997)). For claims arising under the CEA, New York's long-arm statute, N.Y. C.P.L.R. § 302(a), governs the scope of personal jurisdiction. *See Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 1279, 1284 (S.D.N.Y.1989) (holding New Mexico long-arm statute governs scope of personal jurisdiction for claims arising under the CEA) (citing *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)).

The exercise of personal jurisdiction must also comport with the Due Process Clause of the U.S. Constitution. *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104–05 (2d Cir.2006). Because the "application of N.Y. C.P.L.R. § 302(a) meets due process requirements," I address only the requirements under the long-arm statute. *Id.* at 105; *see also United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966) (exercise of personal jurisdiction under New York's long-arm statute does not present constitutional issues because the jurisdictional reach of N.Y. C.P.L.R. § 302(a) over non-domiciliaries is narrower than what is permitted under the Due Process Clause).

■ Section 302(a)(1) permits a court to exercise personal jurisdiction over an out-of-state party if he "transacts any business within the state" and if the "cause of action aris[es] from" the business contacts. N.Y. C.P.L.R. § 302(a)(1); *D.H. Blair & Co.*, 462 F.3d at 104. The transacting business element requires a defendant to have " 'purposely availed [himself] of the privilege of conducting activities within New

York and thereby invoked the benefits and protections of its laws.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 787 (2d Cir.1999) (quoting *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 341, 256 N.E.2d 506 (1970)) (alterations in original). The "arising out of" element requires "a substantial nexus" between the business transaction and the claim. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 31 (2d Cir.1996).

### 2. *Application*

■ It is undisputed that the attempted manipulation claim arises out of the trades Hunter executed on NYMEX on February 24 and April 26, 2006. The sole issue is whether Hunter purposefully availed himself of the privilege of conducting business in New York when he placed the trades from Canada.

A recent case decided in this district, *In re Natural Gas Commodity Litigation,* 337 F.Supp.2d 498 (S.D.N.Y.2004), is directly on point. There, the court held that it had personal jurisdiction over an out-of-state defendant whose out-of-state acts were conducted "with the purpose of manipulating the market for natural gas futures on the *New York* Mercantile Exchange." *Id.* at 517 (emphasis in original). The defendant company had not actually traded natural gas futures on NYMEX, but its trading activities on a Texas-based internet system were sufficient to trigger personal jurisdiction because those activities were intended to affect NYMEX prices.

Hunter's contacts with New York is more direct than the contacts in *In re Natural Gas Commodity Litigation* because he personally placed orders through a NYMEX broker and directed Amaranth traders under his supervision to place orders to trade natural gas futures on NYMEX on February 24 and March 26. *See*

*Sec. & Exch. Comm'n v. Alexander,* No. 00 Civ. 7290 (LTS), 2003 WL 21196852, at *2 (S.D.N.Y. May 20, 2003) (court had personal jurisdiction over Greek citizen residing in Greece who carried out his trades on the New York Stock Exchange from Greece by telephone through a Greek brokerage firm). Hunter was clearly transacting business within the state, albeit by telephone from Canada, which is sufficient to support personal jurisdiction under New York's long-arm statute. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (in light of the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State" (emphasis in original)). Accordingly, Hunter's motion to dismiss for lack of personal jurisdiction is denied.

### B. *The Attempted Manipulation Claim*

I first discuss the legal standards applicable to Rule 12(b)(6) motions to dismiss an attempted manipulation claim under the CEA. I then address whether the CFTC has sufficiently pled the elements of an attempted manipulation claim.

### 1. *Pleading Standards*

### a. *Which Pleading Standard Applies to an Attempted Manipulation Claim under the CEA?*

■ The parties disagree as to whether an attempted manipulation claim under the CEA is subject to Federal Rule of Civil Procedure 8(a)'s liberal pleading standard or the heightened pleading standard of Rule 9(b). Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). By contrast,

Rule 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

District courts are divided on this issue. *Compare U.S. Commodity Futures Trading Comm'n v. Enron Corp.,* 2004 WL 594752, at \*3 (S.D.Tex Mar. 10, 2004) (claims under sections 6(c), 6(d), and 9(a)(2) of the CEA "need not be pled with the factual specificity required by Fed. R.Civ.P. 9(b)"), *and Premium Plus Partners, L.P. v. Davis,* No. 04 Civ. 1851(MRF), 2005 WL 711591, at \*15 (N.D.Ill. Mar. 28, 2005) (declining to apply heightened pleading to manipulation claim under CEA), *with In re Natural Gas Commodity Litig.,* 358 F.Supp.2d 336, 343 (S.D.N.Y.2005) (applying Rule 9(b) to manipulation claim under the CEA).

Only two cases decided in this district have addressed the question of whether heightened pleading is required to assert a manipulation claim under the CEA. *See In re Crude Oil Commodity Litig.,* 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. Jun. 28, 2007); *In re Natural Gas Commodity Litig.,* 358 F.Supp.2d 336. To resolve the issue, both cases followed a "case-specific approach" by examining whether the alleged manipulative scheme sounded in fraud, thereby implicating the heightened pleading standards of Rule 9(b). *In re Crude Oil Commodity Litig.,* 2007 WL 1946553, at \*4–5; *In re Natural Gas Commodity Litig.,* 358 F.Supp.2d at 343. In other words, if a particular manipulation claim sounds in fraud, it must comply with Rule 9(b); if it does not sound in fraud, it need not comply with Rule 9(b). I agree with this approach. Accordingly, I turn to the allegations as pled in the complaint to determine if they sound in fraud.

The CFTC alleges that defendants intended to create artificial prices of natural gas futures contracts by deliberately waiting to sell a substantial number of futures contracts in the closing range on expiration day. This attempted manipulation claim is not premised on allegations of fraud. Defendants are not alleged to have made any false statements or misrepresentations in connection with the alleged attempted manipulation.

In contrast, the two cases decided in this district applied Rule 9(b) because the manipulation claims there involved false statements or the concealment of information. *See In re Natural Gas Commodity Litig.,* 358 F.Supp.2d at 343 (finding that Rule 9(b) applied to manipulation claim because alleged scheme was "classically associated with fraud: the dissemination of '*inaccurate, misleading,* and *false* trading information,' and participation in 'a variety of *fraudulent* trade reporting strategies whose purpose was to . . . manipulate the spot prices of natural gas.'" (quoting amended complaint) (emphasis in original)); *In re Crude Oil Commodity Litig.,* 2007 WL 1946553, at \*5 (applying Rule 9(b) to manipulation claim because complaint alleged that defendants conspired "'to *conceal* the availability, release and/or sale' of defendants' supplies of crude oil . . . and also used proxies to sell their crude oil inventories 'so as to *not appear* to the market as a seller of crude oil'" (quoting amended complaint) (emphasis in original)).

■ Here, the CFTC's theory of attempted manipulation is not based on misleading statements or omissions, but rather on a particular trading strategy. The manipulation is not based on false statements of fact intended to deceive a buyer or seller, but on the timing of trades intended to change the closing price. Because the attempted manipulation claim does not sound in fraud, it is not subject to the heightened pleading standards in Rule 9(b). Instead, the liberal pleading standards under Rule 8(a) apply.

### b. *Pleading Standards under Rule 8(a)*

On a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996); *see Erickson v. Pardus*, —— U.S. ——, 127 S.Ct. 2197, 2199, 167 L.Ed.2d 1081 (2007) (per curiam); *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

In its recent decision in *Bell Atlantic Corp.*, the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45–47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), adopting in its place a "plausibility" requirement. *Bell Atl. Corp.*, 127 S.Ct. at 1969. As interpreted by the Second Circuit, *Bell Atlantic Corp.* did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007). The question is whether the pleading alleges " 'enough facts to state a claim for relief that is plausible on its face.' " *Patane v. Clark*, 508 F.3d 106, 111–12 (2d Cir.2007) (quoting *Bell Atl. Corp.*, 127 S.Ct. at 1974).

### 2. *Elements of Attempted Manipulation*

■ The CEA prohibits "[a]ny person [from] manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2). To state a claim for attempted manipulation, the CFTC must allege (1) an intent to affect market prices and (2) an overt act in furtherance thereof. *U.S. Commodity Futures Trading Comm'n v. McGraw–Hill Cos.*, 507 F.Supp.2d 45, 51 (D.D.C.2007) ("Attempted manipulation is demonstrated by the intent to affect market prices and some 'overt act' in furtherance thereof.") (internal citations omitted); *U.S. Commodity Futures Trading Comm'n v. Johnson*, 408 F.Supp.2d 259, 267 (S.D.Tex.2005); *see also In re Hohenberg Bros. Co.*, 1977 WL 13562, at *7 (CFTC Feb. 18, 1977) ("An attempted manipulation requires only an intent to affect the market price of the commodity and some overt act in furtherance of that intent."). I address the two elements in turn.

### a. *Manipulative Intent*

■ The intent requirement for proving an attempted manipulation and a completed manipulation is the same. *Enron Corp.*, 2004 WL 594752, at *7. To establish intent, "it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Id.* (quoting *In re Indiana Farm Bureau Coop. Assoc.*, CFTC No. 75–14, 1982 WL 30249, at *6 (C.F.T.C. Dec. 17, 1982)). Because "proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." *Id.* (quoting *In re Indiana Farm Bureau Coop. Assoc.*, 1982 WL 30249, at *6); *see also In re Hohenberg Bros. Co.*, 1977 WL 13562, at *7 (because "it is impossible to discover an attempted manipulator's state of mind," intent may be inferred "by a person's actions and the totality of the circumstances").

■ Here, the complaint makes a number of factual allegations from which one could reasonably infer an intent on the

part of defendants to affect the prices of natural gas futures contracts. Hunter's numerous instant message conversations could plausibly be interpreted to reflect such an intent. For example, in an instant message sent on February 24, Hunter revealed that he needed the March 2006 contracts to "get smashed." In another conversation, Hunter astounded a colleague when he disclosed that he had not yet sold his March 2006 contracts and was trying an experiment. On April 26, Hunter told two colleagues that he was waiting to sell his May 2006 contracts, knowing that selling near the end of trading hours would attenuate the effect on the settlement price of Centaurus's large purchases. The CFTC contends that these instant messages, as well as several others, reveal an intent to manipulate prices. Although defendants suggest an alternative interpretation of these instant messages that convey a more benign motive, at this juncture, on a motion to dismiss, all reasonable inferences must be construed in the CFTC's favor. *Bernheim v. Litt*, 79 F.3d at 321.

In addition to the instant messages, the CFTC argues that defendants' concerns about their short swaps positions, which would have benefitted from low natural gas futures settlement prices, as well as Hunter's concern about the effects of Centaurus's trading activities provide additional circumstantial evidence of intent. (Compl. ¶¶ 41, 47–49). These alleged profit motives render the inference of intent even more plausible.

▮ Defendants argue, however, that the CFTC's allegations to support an inference of intent are insufficient without alleging that defendants "sought to cause a price that would actually be *'artificial.'*" (Hunter Mem. at 8 (emphasis in original)). A claim for attempted manipulation, however, does not require that the CFTC assert that an attempt to manipulate prices

would, in fact, affect market prices. *Johnson*, 408 F.Supp.2d at 268 ("CFTC is not required to specifically assert ... a likelihood that the defendants' alleged price manipulation would actually affect market prices."); *In re Hohenberg Bros. Co.*, 1977 WL 13562, at *8 ("demonstrated capability of realizing manipulation" is not a necessary element of attempted manipulation claim). This argument is thus rejected.

From the totality of the circumstances surrounding defendants' trading activities on February 24 and April 26, 2006, I conclude that the CFTC's claim that defendants intended their actions to lower the prices of natural gas futures is plausible.

### b. Overt Acts

The complaint alleges numerous overt acts committed by defendants in furtherance of their intent to manipulate the settlement prices of natural gas futures. Specifically, the CFTC alleges that shortly before the closing range on February 24, the expiration day for the March 2006 natural gas futures, defendants reversed their overall position from short to long in more than 3,000 futures contracts. Defendants then placed orders to sell those contracts during the closing range when prices would be affected by the large volume of trades. (Compl. ¶¶ 33, 35).

The CFTC alleges that defendants perpetrated the manipulative scheme again on April 21. Defendants allegedly instructed NYMEX brokers to sell a total of 1,044 natural gas futures contracts in the last eight minutes of trading. (Compl. ¶¶ 55–58). Eight minutes before the end of trading, Hunter allegedly placed another order with a NYMEX broker to sell 2,000 futures contracts. (Compl. ¶¶ 59–61). These allegations sufficiently meet the overt acts requirement of an attempted manipulation claim.

Defendants, however, contend that to state a claim for attempted manipulation,

the CFTC may not simply allege any overt act, but must allege an unlawful, fraudulent act. Without an allegation of fraud or deception, defendants argue, there is no manipulative conduct, but merely "legitimate speculative trading." (Amaranth Mem. at 5, 6). Quoting a recent Second Circuit decision, defendants assert that "short selling—even in high volumes—is not, by itself, manipulative." (Amaranth Mem. at 9, quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir.2007)). At bottom, defendants raise the issue whether manipulative intent alone can support liability for otherwise legal, open-market transactions.

This question, however, has already been addressed in the context of federal securities laws. In *Securities and Exchange Commission v. Masri*, Judge Holwell expressly "decline[d] to adopt defendants' proposed *per se* rule that open-market activity cannot be considered manipulative based solely on manipulative intent, that is, without additional deceptive or manipulative conduct." 523 F.Supp.2d at 371. Instead, he held that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation." *Id.* at 372.

The open-market transactions at issue in *Masri* involved a specific type of trading strategy known as "marking the close"— the same trading activity at issue in this case. Marking the close refers to the execution of purchase or sale orders at or near the close of the market to affect the closing price of a security. *Sec. & Exch. Comm'n v. Schiffer*, No. 97 Civ. 5853(RO), 1998 WL 226101, at *1 n. 3 (S.D.N.Y. May 5, 1998). Although "transactions made at the close of the day are not prohibited," the timing of such transactions is not only "suspicious," but also "more capable of artificially affecting the price of the securi-

ty." *Masri*, 523 F.Supp.2d at 370. The *Masri* court thus concluded that allegations of "end-of-day" transactions, accompanied by evidence sufficiently indicative of manipulative intent, stated a claim for market manipulation in violation of section 10(b) of the Securities Exchange Act of 1934. *Id.* at 372.

■ Although *Masri* dealt with the interpretation of federal securities laws, there is no doubt that marking the close or any other trading practices, without an allegation of fraudulent conduct, can also constitute manipulation in contravention of the CEA, so long as they are pursued with a manipulative intent. While the 1934 Act prohibits both fraud and manipulation in section 10(b), the CEA has a separate anti-fraud section apart from the anti-manipulation provision. *See Three Crown Ltd. v. Caxton Corp.*, 817 F.Supp. 1033, 1043 n. 19 (S.D.N.Y.1993) (making same observation). When the statute distinguishes fraud and manipulation by addressing them in different provisions, it would be redundant to construe manipulation to require a fraud element. Furthermore, that courts in this district use the "case-specific approach" to determine whether heightened pleading standards apply to an attempted manipulation claim suggests that not all manipulative schemes in contravention of the CEA involve fraud.

This conclusion is in accord with the decisions of other courts that have considered what kinds of acts fall within the ambit of the CEA. The Fifth Circuit defined "manipulation" under the CEA to include "any and every operation or transaction or practice ... calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir.1962). A district court in Texas has held that "[b]uying or selling in a manner calculated

to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots is one form of manipulation, among others." *Enron Corp.,* 2004 WL 594752, at *5 (internal citations omitted). Indeed, even Amaranth Calgary in its compliance manual prohibited " 'marking the close' at or near the close of trading for the primary purpose of attempting to change the closing price." (Compl. ¶ 43).

For the foregoing reasons, I reject defendants' argument that it is necessary to plead a fraudulent act to state an attempted manipulation claim under the CEA. The complaint sufficiently alleges that defendants committed overt acts in furtherance of an intent to manipulate the settlement prices of the March 2006 and May 2006 natural gas futures. Accordingly, the motions to dismiss the attempted manipulation claim are denied.

### C. *The Cover–Up Claim*

#### 1. *Applicable Law*

##### a. *Section 9(a)(4)*

The CFTC alleges that Amaranth sought to "cover up" its alleged manipulative scheme by submitting a letter containing false statements to NYMEX, which is specifically prohibited in section 9(a)(4) of the CEA:

> It shall be a felony [for any] person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, or futures association designated or registered under [the CEA] acting in furtherance of its official duties under [the CEA].

7 U.S.C. § 13(a)(4). The CFTC brings a civil claim under this section pursuant to section 6c of the CEA, which authorizes the CFTC to seek civil monetary penalties for "a violation of any provision" of the CEA. § 13a–1.

No federal court has yet dealt with section 9(a)(4) of the CEA, or addressed whether a "cover up" claim under this section is subject to Rule 9(b). The "use [of a] false writing or document knowing the same to contain any false ... statement ... to a registered entity, board of trade, or futures association" is not fraud in the classic sense where a defendant induces another to surrender something of value by making false representations. § 13(a)(4); *see Black's Law Dictionary* 660 (6th ed. 1990). But it is nonetheless fraud because false statements issued to cover up illicit activities can prevent NYMEX from carrying out its enforcement duties if it relies on those statements. *Cf. United States v. Arcadipane,* 41 F.3d 1, 4 (1st Cir.1994) (noting that 18 U.S.C. § 1001, which is nearly identical to section 9(a)(4) of the CEA, "is intended to promote the smooth functioning of government agencies and the expeditious processing of the government's business by ensuring that those who deal with the government furnish information on which the government confidently may rely"). Accordingly, because claims under section 9(a)(4) sound in fraud, they are subject to the heightened pleading requirements in Rule 9(b).

##### b. *Pleading Requirements Under Rule 9(b)*

The Second Circuit has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (internal citations omitted).

### 2. *Application*

The issue is whether the CFTC has satisfied the heightened pleading requirement under Rule 9(b). It has.

First, the complaint alleges that the statement that Amaranth "did not decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later" was fraudulent. (Compl. ¶ 68; *see id.* Ex. C). Second, the complaint identifies the "speaker" as Amaranth. (*Id.* ¶ 66). Third, the complaint specifies that the statement was made in a letter dated August 15, 2006 and addressed to the NYMEX Compliance Department. (*Id.*). Fourth, the CFTC alleges that this statement was fraudulent because Amaranth had decided to sell the contracts before 2:17 p.m., which is evidenced by two sell orders defendants placed at "about the middle of the close . . . with instructions to hold execution of the order until the last eight minutes of the closing range." (*Id.* ¶¶ 55, 56, 62–66). Although the statement in question is not fraud in the classic sense of duping investors or business partners, it is nonetheless fraudulent in the sense of section 9(a)(4), for it was intended to cover up Amaranth's alleged manipulative scheme from the NYMEX Compliance Department and thwart its investigation of Amaranth's trading activities.

These allegations sufficiently make out a claim under section 9(a)(4) of the CEA and provide fair notice to defendants of the "who, what, when, where and how of the alleged fraud" required under the heightened pleading standards. *United States ex rel. Woods v. Empire Blue Cross & Blue Shield,* No. 99 Civ. 4968(DC), 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997)); *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1207 (S.D.N.Y. 1992) (one goal of Rule 9(b) is "providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense").

Amaranth, however, argues that the allegations in the complaint are "conclusory" and not substantiated by "documentary evidence [or] testimony." (Amaranth Mem. at 24). The CFTC, however, "need only *allege,* not *prove,* sufficient facts to survive a motion to dismiss." *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999) (emphasis in original). The CFTC has alleged facts, such as the two sell orders and Hunter's instant messages, to support its claim under section 9(a)(4). At this stage of the litigation, I accept, as I must, the CFTC's allegations and version of the facts. Defendants' arguments that the CFTC's allegations are insufficient to prove that their statements to NYMEX were false are more properly made in a motion for summary judgment rather than a motion to dismiss. *See In re Natural Gas Commodity Litig.,* 337 F.Supp.2d at 508 (defendants' arguments that plaintiff's allegations fail to establish claim under the CEA should be made in summary judgment motion, not in a motion to dismiss). Accordingly, defendants' motions to dismiss the cover-up claim are denied.

### CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are denied. Counsel shall appear for a pretrial conference on June 13, 2008, at 10:00 a.m.

SO ORDERED.

### *MEMORANDUM DECISION*

Defendants move for reconsideration of the Court's May 21, 2008 decision (the "Opinion") denying their motions to dismiss. *See U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.,* No. 07 Civ. 6682(DC), 554 F.Supp.2d 523, 2008 WL 2123323 (S.D.N.Y. May 21, 2008). They make two

arguments in support of their motion based on the Second Circuit's recent decision in *ATSI Communications v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir.2007). The arguments are rejected, and the motion is denied.

First, defendants argue that the complaint fails to state a claim for attempted manipulation in light of the holding in *ATSI Communications* that "[t]o be actionable as a manipulative act, short selling must be willfully combined with *something more* to create a false impression of how market participants value a security." (Def. Mem. at 3 (emphasis in original), quoting *ATSI Commc'ns*, 493 F.3d at 101). The U.S. Commodity Futures Trading Commission (the "CFTC"), however, alleges that defendants did more than simply place unusually large sell orders in the open market: they amassed large numbers of futures contracts leading up to the expiration day of those contracts; then on the expiration days in question, defendants deliberately waited until several minutes before the close of trading to sell large numbers of expiring futures contracts; defendants knew that unloading a significant portion of their contracts near the end of trading would affect the closing price of those contracts; and defendants did sell within minutes of the close of trading with the intent to manipulate the prices of natural gas futures contracts. According to the complaint, defendants did much more than mere high-volume short selling.

In the Opinion, the Court cited Judge Holwell's decision in *Securities Exchange Commision v. Masri*, 523 F.Supp.2d 361 (S.D.N.Y.2007), which held that "marking the close" could amount to a violation of section 10(b) of the Securities Exchange Act of 1934. Although *Masri* was decided four months after the Second Circuit is-

sued *ATSI Communications*, defendants now contend that *Masri* is bad law in light of the Second Circuit's holding in *ATSI Communications*. In *Masri*, Judge Holwell did not discuss *ATSI Communications*, but did point out that the timing of high-volume, "end-of-day" transactions was not only "suspicious," but also "more capable of artificially affecting the price of the security." *Masri*, 523 F.Supp.2d at 370. Defendants' argument, in substance, is that any difference between high-volume short-selling (the facts in *ATSI Communications*) and high-volume short-selling near the end of closing (the facts in *Masri*) is not sufficient to comply with *ATSI Communications* "something more" requirement.

Ultimately, however, whether "marking the close" could constitute manipulation in contravention of federal securities laws in light of the Second Circuit's decision in *ATSI Communications* is not at issue in this case. *ATSI Communications* and *Masri* involved violations of federal securities laws, while the instant case involves claims under the Commodity Exchange Act (the "CEA").[1] In the Opinion, the Court specifically "reject[ed] defendants' argument," based on *ATSI Communications*, "that it is necessary to plead a fraudulent act to state an attempted manipulation claim under the CEA." 554 F.Supp.2d at 535, 2008 WL 2123323, at *11. In declining to extend the holding in *ATSI Communications* to the instant case, the Court distinguished the two statutes: "While the 1934 Act prohibits both fraud and manipulation in section 10(b), the CEA has a separate anti-fraud section apart from the anti-manipulation provision. When the statute distinguishes fraud and manipulation by addressing them in differ-

---

1. Although "[s]ecurities cases and principles are used as persuasive aids to interpretation of the CEA," *Mormels v. Girofinance, S.A.*, 544 F.Supp. 815, 817 n. 8 (S.D.N.Y.1982), they are only persuasive, and not binding in CEA cases.

538

ent provisions, it would be redundant to construe manipulation to require a fraud element." *Id.* at 534, at \*10. The Court accordingly concluded that an allegation of *any* overt act in furtherance of an intent to affect market prices was sufficient to state an attempted manipulation claim under the CEA. Hence, defendants' reliance on *ATSI Communications* in this case is misplaced.

Second, defendants contend that the Court ignored the holding in *ATSI Communications* that "a claim for manipulation is a claim for fraud subject to Rule 9(b)" and thus incorrectly applied the pleading standards under Rule 8(a) to the attempted manipulation claim. (Def. Mem. at 8). But *ATSI Communications,* which addressed pleading standards for claims under federal securities laws, did not supersede case law regarding pleading standards for claims under the CEA. Although required for an analogous claim under securities laws, fraud is not a necessary element of a manipulation claim under the CEA, as discussed above. Accordingly, in cases involving violations of the CEA, courts in this district have applied a "case-specific approach" to determine the applicable pleading standard by examining whether the alleged manipulative scheme includes a fraud element. *See In re Crude Oil Commodity Litig.,* No. 06 Civ. 6677(NRB), 2007 WL 1946553, at \*4–5 (S.D.N.Y. June 28, 2007); *In re Natural Gas Commodity Litig.,* 358 F.Supp.2d 336, 343 (S.D.N.Y.2005). Because the alleged manipulative acts in this case did not involve fraud, the Court applied the liberal pleading standards under Rule 8(a).

For the foregoing reasons, defendants' motion for reconsideration is denied.

SO ORDERED.